**UNITED STATES of America, Plaintiff,**

**v.**

**NEW CASTLE COUNTY, William C. Ward, Stauffer Chemical Company and ICI Americas Inc. Defendants.**

**NEW CASTLE COUNTY, Stauffer Chemical Company and ICI Americas Inc., Defendants/Third-Party Plaintiffs,**

**v.**

**AVON PRODUCTS, INC., NVF Company, The Budd Company, Hercules, Incorporated, Specialty Composites Corporation, Standard Chlorine of Delaware, Inc., Diamond Shamrock, American Hoechst Corporation, E.I. DuPont de Nemours & Co., Motor Wheel Corpora-** tion, General Motors Corporation, Chrysler Corporation, Amoco Chemical Corporation, Keysor-Century Corporation, Koppers Company, Inc., Chloramone Corporation, FMC Corporation, Allied Corporation, Westvaco Corporation, Wilmington Chemical Corporation, Gates Engineering, Atlantic Aviation Corporation, Kennecott Corporation, Champlain Cable Corporation, Ametek, Inc., State of Delaware and Harvey & Harvey, Third-Party Defendants.

**Civ. A. No. 80-489 LON.**

United States District Court, D. Delaware.

Dec. 21, 1989.

See also, 116 F.R.D. 19.

Richard G. Andrews, Dept. of Justice, Wilmington, Del., of counsel: Ellen C. Teplitzky, U.S. E.P.A., Philadelphia, William A. Hutchins, Dept. of Justice, Washington, D.C., for plaintiff U.S.

B. Wilson Redfearn, of Tybout, Redfearn & Pell, Wilmington, Del., of counsel: George J. Weiner, Paul M. Honigberg, Patrick O. Cavanaugh, and Donavee A. Berger, of Schmeltzer, Aptaker & Sheppard, Washington, D.C., for defendant/third-party plaintiff New Castle County.

James F. Burnett, of Potter Anderson & Corroon, Wilmington, Del., for defendant William C. Ward.

Jeffrey B. Bove, of Connolly, Bove, Lodge & Hutz, Wilmington, Del., of counsel: John W. Wilmer, Jr., of Vorys, Sater, Seymour & Pease, Washington, D.C., Wendy J. Tish, of Stauffer Chemical Co., Westport, Conn., for defendant/third-party plaintiff Stauffer Chemical Co.

Joseph C. Kelly, of ICI Americas, Inc., Wilmington, Del., of counsel: Robert Hayes, Denis V. Brenan, of Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant/third-party plaintiff ICI Americas Inc.

David R. Hodas, Wilmington, Del., of counsel: J. Brian Molloy, of Wald, Harkrader & Ross, Washington, D.C., for third-party defendant Avon Products, Inc.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for third-party defendants NVF Co., General Motors Corp. and Diamond Shamrock.

J.R. Julian, Wilmington, Del., of counsel: Jennifer Berke, of Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for third-party defendant The Budd Co.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., of counsel: Kevin E. Walsh, of Hercules Inc., Wilmington, Del., for third-party defendant Hercules, Inc.

James F. Bailey, of Elzufon & Bailey, Wilmington, Del., of counsel: Joseph G. Manta, of Frumkin & Manta, Philadelphia, Pa., for third-party defendant Specialty Composites Corp.

John C. Laager, of Saul, Ewing, Remick & Saul, Wilmington, Del., for third-party defendant Standard Chlorine of Delaware, Inc.

C. Scott Reese, of Cooch & Taylor, Wilmington, Del., of counsel: Nancy Long, of Morgan, Melhuish, Monaghan, Meyer, Arvidson, Arbrutzer & Liskowski, New York City, for third-party defendant American Hoechst Corp.

Richard Allen Paul, and Pamela Meitner, of E.I. DuPont de Nemours & Co., Wilmington, Del., for third-party defendant E.I. DuPont de Nemours & Co.

David C. Toomey, and Robert F. Stewart, Jr., of Duane, Morris & Heckscher, Philadelphia, Pa., for third-party defendants Motor Wheel Corp. and Allied Corp.

Stephen P. Lamb, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for Wilmington Chemical Corp.

Kurt J. Doelze, of Ferri & Doelze, Wilmington, Del., of counsel: Joseph Armao, Harry A. Short, Jr., Kevin J. Connors, of Liebert, Short, Fitzpatrick & Hirschland, Philadelphia, Pa., for third-party defendant Chrysler Corp.

Howard M. Berg, of Howard M. Berg & Associates, Wilmington, Del., of counsel: Ronald J. Ganim, of Amoco Corp., Chicago, Ill., for third-party defendant Amoco Corp.

William J. Wier, Jr., of Herlihy & Weir, Wilmington, Del., for third-party defendant Keysor–Century Corp.

John C. Phillips, Jr., of Phillips & Snyder, Wilmington, Del., of counsel: Jill M. Blundon, of Koppers Company, Inc., Pittsburgh, Pa., for third-party defendant Koppers Co., Inc.

John W. Noble, of Parkowski, Noble & Guerke, Dover, Del., for third-party defendant Chloramone Corp.

John C. Phillips, Jr., of Phillips & Snyder, Wilmington, Del., of counsel: William R. Herman, Bradford Whitman, of Dechert Price & Rhoads, Philadelphia, Pa., for third-party defendant FMC Corp.

Thomas C. Hughes, of Hughes & Sisk, Wilmington, Del., of counsel: Brigid E. Kenney, of Venable, Baetjer & Howard, Baltimore, Md., for Westvaco Corp.

James P. Collins, of Healy & Collins, Wilmington, Del., of counsel: Blake A. Biles, of Jones, Day, Reavis & Pogue, Washington, D.C., for third-party defendant Gates Engineering.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., of counsel: Franklin S. Eyster, II, of Atlantic Aviation Corp., Wilmington, Del., for third-party defendant Atlantic Aviation.

Robert J. Katzenstein, of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., of counsel: Stephen W. Miller, of Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for third-party defendant Kennecott Corp.

Henry N. Herndon, Jr., Richard D. Kirk, of Morris, James, Hitchens & Williams, Wilmington, Del., for third-party defendants Champlain Cable Corp. and Ametek, Inc.

Robert R. Thompson, and Kevin P. Maloney, Dept. of Justice, Dover, Del., for third-party defendant State of Del.

James McC. Geddes, of Ashby, McKelvie & Geddes, Wilmington, Del., for third-party defendant Harvey & Harvey.

## OPINION

LONGOBARDI, Chief Judge.

The United States of America brought suit against New Castle County ("County"), William C. Ward and Stauffer Chemical Company ("Stauffer") seeking an injunction under section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973 (1976) (as amended). The complaint was amended to add a claim under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606(a) (1980). A second amended complaint was served adding ICI Americas Inc. ("ICI") as a Defendant and a new claim under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking the recovery of the cost the United States had incurred and expected to incur in responding to the alleged releases and threatened releases of hazardous substances from the Tybouts Corner Landfill site (referred to as the "Site" or "Tybouts Corner").

Defendants ICI, County and Stauffer (collectively the "Third–Party Plaintiffs") filed third-party complaints against the State of Delaware ("State") alleging, *inter alia*, that the State should assume some level of responsibility for the disposal of hazardous substances at Tybouts Corner during the period of its operation. The State and the Third–Party Plaintiffs have filed cross-motions for summary judgment on the issue of whether the State is a potentially responsible party under CERCLA.[1] The State contends that it acted as a mere regulator at the Site and was neither an operator nor one who arranged for the disposal of hazardous wastes at the Site and is therefore entitled to summary judgment as a matter of law. The Third–Party Plaintiffs contend the State is a potentially responsible party arguing the State "operated" the Site and "arranged for" the disposal of hazardous wastes at the Site within the meaning of section 107(a)(2) and (3) of CERCLA. The Third–Party Plaintiffs also assert that the State Highway Department transported waste to the Site and seek to impose liability under section 107(a)(4) of CERCLA. Docket Item ("D.I.") 1964 at 7 n. 3. The parties' respective motions address the State's status as a responsible person under section 107(a)(2) and (3) and do not purport to address whether all of the elements of section 107(a)(2) and (3) liability are satisfied.

## I. BACKGROUND OF CERCLA

The key components of the federal regulatory approach to hazardous waste sites are CERCLA and RCRA. Taken together, CERCLA and RCRA regulate solid and hazardous wastes from the time of their generation to ultimate disposition and pro-

---

1. The Court ruled on several of the other issues addressed by the parties in these motions by Order dated July 19, 1989. The instant issues were taken under advisement at that time.

vide a means for obtaining funds for the costs of cleanup of hazardous sites. *See generally* Ferry, *The Toxic Timebomb: Municipal Liability for the Cleanup of Hazardous Waste*, 57 Geo.Wash.L.Rev. 197, 221–33 (1988) (discussing the federal regulatory scheme); 2 S. Cooke, *The Law of Hazardous Waste: Management, Cleanup, Liability and Litigation*, chs. 9–14 (1989) ("S. Cooke, The Law of Hazardous Waste"). A major purpose behind CERCLA is to place the costs of cleanup of designated hazardous sites on those responsible for the contamination.[2] *See United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1377 (8th Cir.1989). The Senate Committee on Environment and Public Works reported that:

> the goal of assuring that those who caused the chemical harm bear the cost of that harm is addressed in [S. 1480] by the imposition of liability. Strict liability, the foundation of S. 1480, assures that those who *benefit financially from a commercial activity* internalize the health and environmental costs of that activity into the *cost of doing business* .... To establish provisions of liability any less than strict, joint, and several liability would be to condone a system in which innocent victims bear the burdens of releases, while *those who conduct commerce in hazardous substances which cause such damage benefit with relative impunity.*

S.Rep. No. 848, 96th Cong., 2d Sess. at 13, *reprinted in* 1 Senate Comm. on Env't and Public Works, 97th Cong., 2d Sess., A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), Public Law 96–510 at 320 (1983) (emphasis added) (hereinafter "S.Rep. No. 848").

█ Section 197(a), which is the basic liability section of CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, provides in part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of ... a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release;

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(1)–(4)(D) (Pocket Part

---

**2.** The paramount idea of CERCLA was to protect the public health, welfare and environment. *See* 2 S. Cooke, The Law of Hazardous Waste at § 12.03[4][c] (discussing the legislative history on this point). Other purposes of the enactment of CERCLA were that it have broad applicability, *id.* at § 12.03[4][e], and that there be a cooperative partnership between the federal and state governments in addressing the hazardous waste problem, *id.* at § 12.03[4][g].

1989).[3] To establish liability under CERCLA, several elements must be established. Among these are (1) the establishment of a particular landfill or disposal site as a "facility";[4] (2) the existence of a "release"[5] or "threatened release"[6] of a "hazardous substance";[7] (3) that the release or threatened release caused the incurrence of "response costs";[8] and (4) the identity of the party sought to be assessed with response costs as a person liable under section 107(a). *See Aceto,* 872 F.2d at 1378–79; *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573, 576 (D.Md.1986); *U.S. v. Bliss,* 667 F.Supp. 1298, 1304 (E.D. Mo.1987).

Persons assessed by the United States with cleanup costs under CERCLA now have an express statutory right to "seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1). Prior to the enactment of section 9613(f)(1) as part of SARA, contribution was often sought under the federal common law. *See, e.g., United States v. New Castle County,* 642 F.Supp. 1258 (D.Del.1986); 2 S. Cooke, The Law of Hazardous Waste at § 14.01[6][c][iv] (1989) (discussing contribution under CERCLA).

Several courts have interpreted CERCLA broadly to achieve its remedial purposes. *See, e.g., Aceto,* 872 F.2d at 1380 ("courts have concluded that a liberal judicial interpretation is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme"). This liberal interpretation has led to the potential imposition of liability upon a wide array of statutory persons. *See, e.g., United States v. Northeastern Pharmaceutical,* 810 F.2d 726 (8th Cir. 1986) (*"NEPACCO"*) (plant supervisor could be an arranger for the disposal of hazardous substances); *State of N.Y. v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985) (stockholder and officer of property owner who managed facility liable as "operator"); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D. Mo.1985) (corporation's founder, chief executive officer and majority stockholder liable under CERCLA); *but see Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155 (7th Cir.1988) (found that a supplier of wood preserving chemicals who designed and built the contaminated wood processing plant, trained the plant's personnel to operate the machinery and licensed the plant to use its trademark in connection with treated lumber was not an "operator" under CERCLA); *Florida Power & Light Co. v. Allis–Chalmers Corp.,* 18 Envt'l.L.Rep. 20998 (S.D.Fla.1988) (maker of contaminated mineral oil transformers not liable for contribution to party who disposed of the transformer). The Supreme Court has recently held that states may "be liable for cleanup costs recoverable under CERCLA." *Pennsylvania v. Union Gas Co.,* 491 U.S. ——, ——, 109 S.Ct. 2273, 2278, 105 L.Ed.2d 1 (1989). This decision was based on the SARA amendments to CERCLA. Thus far, no court has held a state liable as a responsible person under CERCLA based on the activities of the state taken in its capacity as a regulator. *Cf. United States v. Dart Indus. Inc.,* 847 F.2d 144 (4th Cir.1988) (DHEC loosely regulated site, not liable under CERCLA); *United States v. J. B. Stringfellow,* No. 83–2501 JMI, Peetris, Special Master (C.D.Cal. Oct. 6, 1989) (or-

---

**3.** The SARA amendments to the above-quoted liability provisions have not materially changed the statutory language with respect to the cross-motions now before the Court.

**4.** *See* 42 U.S.C. § 9601(9) (definition of "facility"); *see also United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.1985) ("the definition includes virtually any place at which hazardous wastes have been dumped, or otherwise disposed of").

**5.** *See* 42 U.S.C. § 9601(22) (definition of "release").

**6.** CERCLA does not provide a definition for "threaten." *See U.S. v. Northernaire Plating Co.,* 670 F.Supp. 742, 747 (W.D.Mich.1987) (discussing a threat of release).

**7.** *See* 42 U.S.C. § 9601(14) (definition of "hazardous substance").

**8.** While CERCLA does not define "response costs", it does define "respond" or "response." *See* 42 U.S.C. § 9601(25).

der on directed verdict against the State of California finding, *inter alia*, that California exceeded mere regulation).

## II. SUMMARY JUDGMENT

 Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (1983). The "materiality" of particular facts is to be determined from the substantive law governing the issues and it is only disputes over these facts that will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, the mere fact that both parties have filed motions for summary judgment does not mean that the Court must grant summary judgment for one of the parties as a matter of law. *See Mingus Constructors, Inc. v. U.S.,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

Where, as here, cross-motions for summary judgment have been presented, the Court is guided by the Third Circuit's discussion of cross-motions for summary judgment in *Rains v. Cascade Industries, Inc.* where it said:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether

genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains,* 402 F.2d 241, 245 (3rd Cir.1968). This rule is grounded in the rationale that the parties may be basing their respective motions on different legal theories each of which would likely depend on different material facts. *Schlytter v. Baker,* 580 F.2d 848, 849 (5th Cir.1978). Where, however, both moving parties "proceed on the same legal theory and on the same material facts, ... the basis for the rule disappears." *Id.; see generally* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 ("Wright & Miller"). The legal theory upon which both movants have proceeded under these particular cross-motions is the status[9] of the State as a potentially responsible party under section 107(a).[10]

 The Third–Party Plaintiffs argue that the State's motion should be considered as a motion to dismiss for failure to state a claim. They argue that the State has failed to submit sufficient factual information to satisfy its burden under Rule 56(c) because it makes virtually no mention of the factual record developed in the case other than noting that it issued permits pursuant to which the Site operated. Accordingly, they argue the State's motion must be denied unless the Court finds the the Third–Party Plaintiffs can prove no set of facts that would entitle them to relief.[11] The Court disagrees with this argument. The State does not dispute the facts as presented by the Third–Party Plaintiffs.

9. A determination by the Court that the State's actions at Tybouts Corner do not give rise to the attachment of section 107(a) *status,* means that further proceedings on the other elements of section 107(a) *liability* will not be necessary. Neither of the parties have discussed any of the other liability issues in these cross-motions. However, should the Court grant the Third–Party Plaintiffs' cross-motion as to the State's *status,* the Court would eventually have to reach other section 107(a) *liability issues.*

10. The State bases its arguments on sections 107(a)(2) and (3), 42 U.S.C. §§ 9607(a)(2) and (3). Third–Party Plaintiffs' arguments are also

premised on these sections as well as an argument based on section 107(a)(4), 42 U.S.C. § 9607(a)(4).

11. In *Mingus,* the court observed that "where, as here, [a second party] cross-moved for partial summary judgment on the identical issues on which the [other party] had moved for summary judgment and asserted that there were no disputed material facts relating to those issues, that claim bears upon and makes suspect [the second party's] ... contention that there were disputed factual questions." *Mingus,* 812 F.2d at 1391.

*See* D.I. 1966 at 2.[12] *Cf.* 6 J. Moore, W. Taggert & J. Wicker, Moore's Federal Practice ¶ 56.15[3] at 56–265 (1986) ("Moore's Federal Practice") ("While normally the opposing papers will not aid the movant, the movant is entitled to whatever support they afford."). The State argues that it is entitled to summary judgment as a matter of law because the undisputed facts indicate that it acted in a nonculpable regulatory manner and was not a responsible party under section 107(a) of CERCLA. The Supreme Court has held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (emphasis in the original); *see also* 10A Wright & Miller § 2727 at 25–26 (1989 Supp.). The Supreme Court added that "[i]n cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Put another way, the State will have met its burden under Rule 56 "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.[13] The Court finds that the State has shown sufficient factual material to allow a decision under Rule 56. Accordingly, the Court is obliged to determine if, based on the undisputed facts, the State is entitled to prevail as a matter of law, considering the facts and all reasonable inferences to be drawn therefrom, most favorably to the Third–Party Plaintiffs. *See Matsushita Elec. Industrial Co. v. Zenith Radio*, 475

U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 900 (3rd Cir.1987); *Hersh v. Allen Products Co., Inc.*, 789 F.2d 230, 232 (3rd Cir.1986); 6 Moore's Federal Practice ¶ 56.15[3] at 56–255.

The Third–Party Plaintiffs argue that they are entitled to summary judgment because the State has failed to set forth facts demonstrating that there is a genuine issue of material fact concerning the Third–Party Plaintiffs' cross-motion for summary judgment. They argue that the State's failure to contest the facts set forth by the Third–Party Plaintiffs entitle them to summary judgment. Federal Rule of Civil Procedure 56(e) provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, *if appropriate*, shall be entered against him.

(Emphasis added). While it may be true that once the moving party has met his burden under Rule 56, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*'", *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (emphasis in original), this begs the question of whether that burden has been met in the first instance.

The State has not disputed the facts of record in this case. Rather, it asserts it is entitled to summary judgment on the issue of its status as a potentially responsible party as a matter of law and that the Third–Party Plaintiffs' motion on this issue must be denied as a matter of law. The State's argument is, in essence, an asser-

**12.** It is important to note that while the State does not dispute the facts as presented by the Third–Party Plaintiffs, that is not to say that the conclusory allegations of the Third–Party Plaintiffs, which may or may not be substantiated in the factual record, are also accepted.

**13.** The Supreme Court distinguished *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26

L.Ed.2d 142 (1970), saying *Adickes* should not "be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the non-moving party bears the burden of proof." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

tion that partial summary judgment in favor of the Third–Party Plaintiffs is not "appropriate" under Rule 56 based on the undisputed facts. Accordingly, the Court must decide in resolving the Third–Party Plaintiffs' motion whether, *vel non,* they are entitled to judgment as a matter of law. *See* Rule 56(c) and (e); *see also* 6 Moore's Federal Practice ¶ 56.15[1.–0] at 56–201–04 ("In ruling on a motion for summary judgment the court's function is to ... grant summary judgment, if at all, where there is no [genuine] issue [of material fact] *and on the substantive law the movant is entitled to judgment.*"). In resolving the Third–Party Plaintiffs' motion, all the facts and reasonable inferences drawn therefrom, must be considered most favorably to the State. *See Hersh,* 789 F.2d at 232.

## III. FACTUAL BACKGROUND

For purposes of this motion, the State does not dispute the facts as presented by the Third–Party Plaintiffs in their Answering Brief (D.I.1964). D.I.1966 at 2.[14] The State contends that based on these facts it is entitled to summary judgment as a matter of law. Accordingly, the Court will decide these cross-motions for summary judgment based on those facts.

The Tybouts Corner site was envisioned as a model landfill site that would be regulated under Delaware's then newly enacted Solid Waste Disposal Code (the "Disposal Code").[15] Since the Site was to be a model vehicle for the implementation of the Disposal Code, the State involved itself in several aspects of the Site including site selection, planning, design, operations and determining the types of wastes suitable for disposal at the Site. Prior to the official adoption of the Disposal Code, preliminary versions of it were circulated and utilized in the planning for and design of the Site.

The person who was primarily responsible for drafting the Disposal Code was Robert Westerman, an official of the State Board of Health.[16] The Disposal Code, even prior to its official enactment, formed the basis of the planning for the Site.[17] Mr. Westerman's involvement with the Site began early as one of the people who participated in inspection tours of potential landfill sites, including Tybouts Corner. As part of the permit approval process, the State required the submission of detailed information about the Site, its surrounding area and proposed procedures for the operation of the Site.[18] The State's purpose in requiring these submissions was to ensure, to the greatest extent then believed possi-

14. At oral argument, the Court received assurances that all of the facts upon which the Third–Party Plaintiffs rely were contained in the Appendix to their motion. *See* D.I.2034 at 37–38.

15. The Delaware State Board of Health officially adopted the Disposal Code on December 19, 1968, as Part 38 of the State Sanitary Code. Preliminary versions were made available as early as June, 1968. D.I.1964A at A26–A32.

16. The Disposal Code attempted to codify the most recent scientific developments in the planning, design and operation of sanitary landfills that was available at the time. D.I.1964A at A127.

17. The permit applications for the Site were prepared on the basis of preliminary versions of the Disposal Code. D.I.1964A at A34, A35.

18. *See* Disposal Code at § 38.32. Although the permit to operate the Site was dated December 9, 1968, which was prior to the official adoption of the Disposal Code (as were the application and materials in support of the application for

the permit), the application was supported by those submissions required by section 38.32. The permit application contained the following information in its support:
1. A plan of operations.
2. A topographic map which indicated the grades, location of borings and proposed site limits.
3. A plan of construction proposed for the site.
4. Soils boring data from field borings.
5. Laboratory reports indicating permeability and soil classification results.
6. Soils profiles showing general ground water elevation and different soil strata.
7. A general property plan with a location of the proposed site in relation to neighboring properties.
8. A general area plan showing the relationship of the proposed site to buildings within a one (1) mile radius of the center of the site property.
9. Proposed contract and specifications for the operation of the landfill.
10. New Castle County Ordinance 67–11 containing Regulations for Garbage and Rubbish Collection and Disposal as adopted.

ble, that it would only give approval to sites that were designed and operated to be environmentally safe. Since groundwater contamination is a major concern when a landfill such as Tybouts Corner is operating, the State required extensive testing of the hydrogeological characteristics of the Site.[19] The State also addressed other particular environmental concerns, such as refuse cell construction, refuse soil compaction, daily and final cover and the maintenance of various bodies of water to serve as a natural filtration and settling system for ground and surface water. D.I.1964 at 8. The State Board of Health also received

regular reports of the activities at the Site. D.I.1964 at 9-10.[20]

The State, as expected pursuant to its role as guardian of the health and welfare of its citizenry, played a key role in determining the types of waste permitted to be dumped at the Site. The State was aware of the possibility that there were industrial and potentially hazardous wastes being generated in the area served by the Site.[21] Different types of wastes could only be accepted after State approval pursuant to the provisions of the Disposal Code.[22] Additionally, because the County lacked any

**19.** The County drilled over thirty borings in the proposed site and prepared and submitted detailed plans depicting soil layers. These borings were used to prepare a soil profile plan required by the Disposal Code, § 38.32(i). *See* D.I.1964A at A60. The County also submitted a soils permeability report. *See* D.I.1964 at 43–44 n. 28.

The State undertook an independant review of the Site's hydrogeological characteristics. The Water and Air Resource Commission ("WARC") concluded that a continuous clay layer of soil existed beneath the area of the Site, a conclusion concurred with by the State Board of Health. The State also consulted with an employee of the Soils Conservation Service, a federal agency, and the Delaware State Geologist in determining whether the hydrogeology of the Site was suitable. Additionally, the State obtained independant verification of the suitability of the Site from experts at the University of Delaware. D.I.1964 at 9.

**20.** These reports indicated the amounts of wastes accepted; total operating costs; any changes from the original plans, specifications and reports; Landfill volume used; identification of completed areas; and repairs to areas that had been given final cover. D.I.1964A at A64.

**21.** In his deposition Robert Westerman stated: "I was aware that what we're calling special solid wastes [i.e., hazardous waste, industrial waste, and sewage treatment residue,] here existed...." D.I.1964A at A121. When asked if he could "rule out the possibility that there would be instances when industrial waste might be presented for deposit at this Landfill ....", he indicated that "[t]hey weren't ruled out, no." *Id.* at A121–A122.

**22.** Section 38.42(b)10 of the Disposal Code provided: "Special solid waste. Hazardous wastes, industrial waste, and sewage treatment residues shall not be deposited at any landfill without first submitting a plan for such disposal to the

Board of Health and obtaining approval of this plan from the Board of Health."

Robert Westerman, who at the time was the Director, Division of Solid Wastes, Bureau of Environmental Health of the State of Delaware, in a letter dated January 23, 1969, interpreted section 38.42(b) 10 in the context of a reply to a request for an interpretation from the Department of Public Works, New Castle County, as follows:

[T]he prime concern of the State Board of Health is to ensure that hazardous solid wastes are recognized by the *operating authority* and that suitable means for their disposal are developed and utilized. Industrial solid wastes may be of many kinds, some of which are hazardous (such as containers in which arsenic has been stored). For the most part, *industrial solid wastes are an unknown quantity at the present time.* This is why the Solid Waste Disposal Code, item 10, page 11, [i.e., section 38.42(b)10] exists—to make the *operational authority responsible for identification of the industrial solid wastes coming into a landfill* and to establish a "review" of these wastes for potential hazards (see definition of hazardous solid wastes—38.105). The staff of the *Board of Health* must *"review"* these wastes for potential hazards, *also.* This is why a plan must be submitted to the Board of Health.

\*　\*　\*　\*　\*　\*

I suggest ... that an effort be made to identify all industrial solid wastes accepted—to the greatest extent possible. For example, the empty steel and cardboard drums may have contained hazardous substances....

\*　\*　\*　\*　\*　\*

For the present time, the equipment operators and refuse supervisor may offer a means of detection of hazardous solid wastes. They should keep their eyes open and be inquisitive. When solid wastes accepted are obviously non-hazardous, they may be routinely accepted at the landfill.... Constant vigilance will be necessary, however.

D.I.1964A at A69 (emphasis added).

special capability to test and evaluate wastes, the State and the generator of the wastes were contacted by the County to determine whether certain wastes could be accepted. D.I.1964 at 11. The State Highway Department also transported wastes to the Site. D.I.1964 at 7 n. 3. The State did, on separate occassions approve the disposal of particular wastes.[23]

## IV. CERCLA LIABILITY

The State argues that the language of section 107(a) plainly indicates that the State, in this case, is not a potentially responsible party. The mere granting of permits, argues the State, coupled with the regulatory actions it took, do not rise to the level of the actions of an operator or one who arranges for the disposal of hazardous wastes. The Third–Party Plaintiffs dispute this and argue that the actions of the State do give rise to liability under subsections 107(a)(2) as an operator and (a)(3) as an arranger. Third–Party Plaintiffs also ar-

gue the State is a potentially responsible party under section 107(a)(4) of CERCLA as a transporter.[24]

### A. Operator Liability

■ The definition of "operator" provided by CERCLA has given little guidance to the courts in determining if a particular person or entity is liable as an operator.[25] In attempting to resolve the meaning of the terms "owned or operated" in the context of section 101(20)(A)(ii) of CERCLA, Judge Easterbrook of the Seventh Circuit has suggested attaching the ordinary meaning to the terms rather than a highly technical meaning. See Edward Hines Lumber, 861 F.2d at 156.[26] Several cases have attempted to give substance to liability as an operator. Generally, the cases have construed the term broadly "to effectuate the perceived intent of Congress that liability under section 107(a) should extend to all who profit from the treatment or disposal of hazardous waste." 2 S. Cooke,

**23.** For example, the State Board of Health prohibited the disposal of spent liquor wastes, containing methanol and toluene from Fluorodynamics Incorporated. D.I.1964A at A72–A73. The State Board of Health approved the disposal of waste from Stauffer Chemicals. D.I.1964A at A91, A95, A107.

**24.** As an aid in determining these cross-motions, the Court will address the legal theories in the following order: first, section 107(a)(2) operator status; second, section 107(a)(3) arranger status; and third, section 107(a)(4) transporter status. The relative arguments of the respective parties will be considered in accordance with the principles enunciated in Hersh, 789 F.2d at 232.

**25.** With respect to onshore facilities, the term "owner or operator" means "any person owning or operating such facility...." 42 U.S.C. § 9601(20)(A)(ii) (1983 and 1989 Pocket Part). With respect to abandoned facilities, such as Tybout's Corner, "owner or operator" means "any person who owned, operated, or otherwise controlled activities at such facility immediately prior to such abandonment." 42 U.S.C. § 9601(20)(A) (1983) (emphasis added). The amended version of that section defines owner or operator as "in the case of any facility, title or control of which was conveyed due to ... abandonment, or similar means to a unit of State or local government, any person who owned, operated or otherwise controlled activities at such facility immediately beforehand."

42 U.S.C. § 9601(20)(A)(iii) (Pocket Part 1989) (emphasis added). The Amendment also provides that:

> (D) The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through ... abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

42 U.S.C. § 9601(20)(D) (Pocket Part 1989).

**26.** Attempting to restore some integrity to the interpretation of the terms, Judge Easterbrook stated that "[t]he definition of 'owner or operator' for purposes of earthbound sites must come from a source other than the text. The circularity strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings." Edward Hines Lumber, 861 F.2d at 156 (discussing section 101(20)(A)(ii)); cf. Artesian Water Co. v. Govern. of New Castle County, 851 F.2d 643, 648 (3rd Cir.1988) (discussing "circuitous" language of CERCLA).

The Law of Hazardous Waste § 14.01[5][c][ii] at 14–70 (emphasis added); *see also State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1312–13 (N.D. Ohio 1983). Surely, however, there must be some limitations contemplated by CERCLA because, in a sense, every member of society profits from the disposal and treatment of hazardous and non-hazardous wastes. The legislative history and cases indicate that it is relevant in determining liability to consider whether the "person" charged with CERCLA liability profited in a commercial sense, as opposed to a general societal health sense. *See, e.g.,* S.Rep. No. 848 at 13 (especially underlined portions); 126 Cong.Rec. 30932—4 (1980) (Remarks of Sen. Randolph).[27] CERCLA defines those "persons" to include, *inter alia,* individuals, corporations, states, municipalities and political subdivisions of states. 42 U.S.C. § 9601(21).

Several courts have applied a so-called "activity/contacts" analysis to the determination of operator liability. In *U.S. v. Conservation Chemical,* 628 F.Supp. 391 (W.D. Mo.1985), the court imposed CERCLA liability upon an individual, Mr. Hjersted, who was the founder, chief executive officer and majority shareholder of the Conservation Chemical Company ("CCC"). Hjersted had been the sole technical person at CCC and the person to whom plant managers reported. He also controlled CCC's financial matters, made decisions concerning CCC's new business ventures and administered the affairs of the corporation and executed contracts on its behalf. He was also responsible for environmental controls at CCC and personally visited CCC sites. Hjersted personally planned the CCC site,

supervised its construction and conceived of many of the waste treatment systems used at the CCC site. In short, the court said that he was, and always had been, the "boss" at CCC. The court stated that *personal* liability under sections 107(a)(1) and (a)(2) could be placed on Hjersted "if it were established that his participation was of the nature and degree which would warrant imposition of *personal* liability." *Conservation Chemical,* 628 F.Supp. at 419 (emphasis added). Based on these facts and the "high degree of *personal* involvement in the operation and the decision-making process [which] was particularly acute during the early years of the corporation", the court concluded that the imposition of personal liability was appropriate. *Id.* at 420.

In *Shore Realty Corp.,* 759 F.2d 1032, the court found Mr. LeoGrande *personally* liable as an "owner or operator" under section 107(a). The court found that "an owning stockholder who *manages* the corporation [which is sought to be held responsible for response costs] is liable under CERCLA as an 'owner or operator.'" *Id.* at 1052. "In any event, LeoGrande is *in charge of the operation* of the facility in question, and as such is an 'operator' within the meaning of CERCLA." *Id.; see also U.S. v. Carolawn Co.* 21 Env't Rep.Cas. 2124, 2131 (D.S.C.1984) ("to the extent that an *individual* has *control or authority over the activities* of a facility from which hazardous substances are released or *participates in the management* of such a facility, he may be held liable for response costs incurred at the facility notwithstanding the" business' corporate character.) (emphasis added); *United States v. North-*

27. In *Georgeoff,* the court stated that:
It is also clear from the Congressional debates that Congress intended to have the chemical industry pay for the costs of this cleanup. EPA argued that "society should not bear the cost of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dump site owner-operator who has *profited or otherwise benefitted from commerce involving these substances* and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created ... relieving *industry* of responsibility establishes

a precedent seriously adverse to the *public* interest...." S.Rep. No. 848, 96th Cong. 2d Sess. 98 (1980).
*Georgeoff,* 562 F.Supp. at 1312 (emphasis added). This is further borne out by the fact that Congress imposed certain taxes upon various industries, *e.g.,* oils, petrochemicals, chemicals, etc., to help set up the fund to pay for response costs. *See* 26 U.S.C. § 9507(b); *Exxon Corp. v. Hunt,* 475 U.S. 355, 365 n. 8, 106 S.Ct. 1103, 1111 n. 8, 89 L.Ed.2d 364 (1986); *Aceto,* 872 F.2d at 1377 (discussing the purpose and financing of Superfund); *Georgeoff,* 562 F.Supp. at 1312.

eastern Pharm. & Chem. Co., Inc., 579 F.Supp. 823, 848 (W.D.Mo.1984) ("NEPACCO") ("person who owns an interest in a facility and is actively participating in its management" may be liable as owner or operator) (emphasis added), aff'd in part, rev'd in part, 810 F.2d 726 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)[28]; United States v. Mottolo, 629 F.Supp. 56 (D.N.H.1984). Both parties present arguments with respect to these cases. The State argues that these cases are properly limited to the imposition of personal liability upon individuals such as corporate officers and shareholders. Further, the State argues that none of the cases address the issue of a State or governmental entity as a liable person under the activity/contacts analysis. The Third–Party Plaintiffs argue that these cases establish it is the ability to control (not the actual control of) the activities that violate CERCLA that is important in establishing CERCLA liability. Furthermore, because "states" are included among those listed in the CERCLA definition of "person", 42 U.S.C. § 9601(21), the Third–Party Plaintiffs argue that these cases are not properly limited to corporate officers and the like but should be read to encompass the liability of a state because they all indicate the broad scope of CERCLA in imposing liability. See, e.g., State of Idaho v. Bunker Hill Co., 635 F.Supp. 665 (D. Idaho 1986) (parent corporation was owner or operator even though its subsidiary owned and operated the facility).

The Court is not persuaded that these cases are controlling with respect to the instant matter. Each is factually distinguishable in that they all involved some form of a corporate-like entity and/or an individual who actually did (or could have)

controlled or managed that entity. These cases were merely following the statutory mandate that "individuals", and not just the corporations they work for or own, can be held liable as "persons" (42 U.S.C. § 9601(21)) and thus were "owners or operators" (42 U.S.C. § 9601(20)). The Court also believes that "[m]ere ability to exercise control as a result of the financial relationship of the parties is insufficient for liability to attach. The entity [or person sought to be strapped with liability] must actually exercise control." Rockwell Intern. Corp. v. IU Intern. Corp., 702 F.Supp. 1384, 1390 (N.D.Ill.1988) (emphasis added); see also Edward Hines Lumber Co. v. Vulcan Materials Co., 685 F.Supp. 651, 656–57 (N.D.Ill.) ("the clear language of § 9607(a)(2) imposes liability only upon those who actually operate a 'facility' within the meaning of CERCLA. It does not include the designer or builder of a manufacturing system at a site containing the facility."), aff'd, 861 F.2d 155 (7th Cir. 1988) (emphasis added).[29] Also, in each of these cases, liability was asserted against a person who had commercial, financial or proprietary interests at stake in relation to the hazardous substance.[30] By imposing liability on these individuals, the courts were merely following the Congressional policy that those who plant their polluted seed should pay for the fruit they bear. See supra, S.Rep. No. 848 at 13. In this case, the facts presented paint a much different picture. The State participated at Tybouts Corner in its regulatory capacity as protector of the health, safety and welfare of its citizens. It did not participate or have the ability to control the Site with any proprietary or financial interests at stake.

28. It should be noted that the District Court found individual "owner or operator" liability against certain individual officers, shareholders and a supervisor of a particular facility. Because the District Court focused on the wrong facility, the Eighth Circuit reversed. See NEPACCO, 810 F.2d at 743.

29. "Operator", with respect to abandoned facilities, is defined, inter alia, as one who "otherwise

controlled", suggesting that some control actually occurred.

30. Conservation Chemical involved an individual who was the founder of the corporation, as well as the CEO and a majority shareholder; Shore Realty involved an individual who was an officer and stockholder; NEPACCO involved shareholders, officers and supervisors; Mottolo involved a corporate officer; and Bunker Hill involved a parent corporation.

The State did not have any commercial interests at stake in the Site.

Recently, there has been judicial consideration of a government entity's liability as an operator under CERCLA.[31] The Fourth Circuit, in *Dart*, 847 F.2d 144, affirmed a District Court finding that the South Carolina Department of Health and Environmental Control ("DHEC") was not an owner or operator of the abandoned Fort Lawn waste site.[32] In *Dart*, the generators of the hazardous wastes alleged, in their third-party complaint, that DHEC was liable under CERCLA because it controlled the activities at the Fort Lawn site.[33] DHEC regulated the activities at the site pursuant to South Carolina statutes. Additionally, "DHEC approved and disapproved applications to store wastes at Fort Lawn, inspected the site, and required proper transportation of the wastes delivered to Fort Lawn." *Dart*, 847 F.2d at 146. The

**31.** It is interesting to note that these cases do not even mention the activity/contacts analysis as set forth in the cases discussed above.

**32.** This case was disposed of on the basis of the dismissal of the third-party complaint of the generators of the hazardous wastes.

**33.** The District Court summarized the allegations of the third-party complaint as follows:

[D]uring the period 1970–1973 the site was used by South–Eastern Pollution Control (SEPCO) to store and dispose of waste solvents and other hazardous chemicals; that in 1972 the State of South Carolina issued an administrative order citing SEPCO for having at the site materials of a known hazard level, some of which had escaped from containers and thereby causing environmental damage [ (footnote omitted) (DHEC was acting pursuant to South Carolina statute in this regard) ]; that thereafter South Carolina commenced a suit in court to compel SEPCO to clean up the site; that in 1973 SEPCO became bankrupt leaving hazardous wastes at the site; that DHEC took no action to determine the extent of contamination or to remove wastes from the site; that in 1974 DHEC entered into an "arrangement" with Columbia Organic Chemical Company (COCC) permitting COCC to store and dispose of hazardous waste at Fort Lawn and pursuant to which COCC formed a subsidiary, South Carolina Recycling and Disposal, Inc. (SCRDI) to operate the facility and in October, 1978 DHEC granted approval to SCRDI for disposal of wastes at Fort Lawn and committed to install three monitoring

District Court concluded that DHEC "did not at any time own or operate" the site. *United States v. Carolawn Co., Inc.*, 698 F.Supp 616, 621 (D.S.C.1987). After summarizing the involvement of DHEC at the site, the court stated that "all the third party complaint alleges against DHEC is a *series of regulatory actions* consistent with its *statutory mandate.*" *Id.* (emphasis added). Based on this, DHEC was found not to be a responsible party under CERCLA.

The Fourth Circuit, affirming the District Court's decision, held that DHEC was not an owner or operator of the site within the meaning of CERCLA. The Circuit Court explained:

First, under § 9601(20)(A), an owner or operator includes the entity that "*controlled activities at such facility*" before a declaration of bankruptcy. 42 U.S.C. § 9601(20)(A)(iii). The generators

wells at the site and to take samples periodically each three months to check for contamination; that DHEC never installed the monitoring wells; that in effect DHEC, COCC, and SCRDI operated the Fort Lawn site following SEPCO's bankruptcy; that on December 20, 1977 SCRDI sold the Fort Lawn site to Carolawn Company, Inc. (Carolawn) which acquired it to construct and operate a waste incinerator; that on March 14, 1978 Carolawn advised DHEC that it intended to store wastes at the site until incineration could be accomplished; that without a permit, Carolawn solicited generators to send their wastes to the site; that Carolawn required companies interested in doing business with it to forward information to DHEC on the waste contemplated for shipment to Carolawn; that DHEC then analyzed this information and granted or denied approval for disposal of waste at Carolawn; that DHEC required each generator sending wastes to Carolawn to comply with a waste tracking manifest system, and permitted Carolawn to accept waste for incineration although Carolawn did not obtain a permit to incinerate wastes as required by South Carolina law; that in spite of its knowledge that the site was in deplorable condition and should be cleaned up and its knowledge of serious violations of state law, DHEC continued to authorize new customers to send wastes to the site; that in 1980 Carolawn ceased operations, leaving wastes at the Fort Lawn site; and that, in 1982, the United States completed clean up of wastes on the surface of the Fort Lawn site.
*U.S. v. Carolawn Co., Inc.*, 698 F.Supp. 616, 618–19 (D.S.C.1987).

argue that DHEC controlled the activities at Fort Lawn before Carolawn abandoned the site in 1980. During this time, DHEC *loosely regulated* the activity at the site *pursuant to* [South Carolina hazardous waste statutes.] DHEC approved or disapproved applications to store wastes at Fort Lawn, inspected the site, and required proper transportation of the wastes delivered to Fort Lawn. However, there is no allegation that DHEC went beyond this *governmental supervision* and *directly managed Carolawn's employees or finances* at the Fort Lawn site. Thus, this court finds that DHEC is not an owner or operator under § 9601(20)(A)(iii).

*Dart*, 847 F.2d at 146 (emphasis added). The generators also argued that DHEC was implicated under section 9601(20)(D).[34] After analyzing the pertinent allegations, the court stated:

As with the claim under § 9601(20)(A), these allegations that DHEC did not properly monitor the site or facilitate the cleanup fail to characterize DHEC as an owner or operator. The generators are unable to specify any *"hands on"* activities by DHEC that contributed to the release of hazardous wastes. The district court appropriately described DHEC's activities as merely *"a series of regulatory actions."*

*Id.* (emphasis added).

The Third–Party Plaintiffs contend that *Dart* is distinguishable because, they allege, the State had significantly more involvment in the Tybouts Corner site than DHEC had at the Fort Lawn site. They argue that the State's involvment at Tybouts Corner was not the exercise of routine regulatory authority but, rather, was a series of case-by-case, operational determinations by the State. The State asserts that their level of involvment at Tybouts Corner was minimal compared to DHEC's involvment at Fort Lawn and that therefore summary judgment in its favor is appropriate. There are several points of comparison and contrast between the involvment of the State at Tybouts Corner and DHEC at Fort Lawn.

In both instances, generators of wastes, which were allegedly hazardous, were granted approval to dump such wastes at the respective sites. Approval to dump wastes was contingent, in both cases, upon the submission of detailed information about the type of wastes proposed to be dumped at the respective site and an analysis of the information by the governmental entity. Additionally, in both instances, the governmental entity from whom contribution was sought, acted pursuant to state statutory and regulatory mandate. Also, DHEC was aware that SEPCO had left hazardous wastes at the Fort Lawn site and yet, after SEPCO became bankrupt, DHEC did not determine the extent of contamination at the site or remove the known hazardous wastes. This is somewhat analogous to the allegation, conceded by the State to be true, that the State was aware that potentially hazardous wastes were being generated in the area served by Tybouts Corner. The State's action, however, was not nearly so egregious as DHEC's actions—DHEC was aware of the deplorable conditions and state law violations of the site and yet took no action.

DHEC actually committed itself to take part in the operation of the Fort Lawn site when it agreed to install ground-water monitoring wells. DHEC never made good on that agreement. In spite of this agreement, the court still *declined* the invitation to find DHEC liable under CERCLA. In contrast, after the initial tests on the Tybouts Corner groundwater were conducted (tests which the State participated in as part of the site approval process), the State merely required the submission of various reports of the conditions at the Site and adherence to the relevant statutory and regulatory guidelines. The State required the implementation of the monitoring program as part of the permit approval process. D.I.1964A at A49. Additionally, the

---

**34.** Section 9601(20)(D) provides governmental entities with immunity from liability in certain instances unless it "caused or contributed to the release or threatened release of a hazardous substance...."

activities of the State, such as mandating the details of refuse soil compaction and construction, the thickness of daily cover and final cover over the refuse, which the Third–Party Plaintiffs characterize as "mandating ... day-to-day operational details" (see Letter to the Court dated July 10, 1989, pursuant to Local Rule 3.1(E) at 7), were all required as part of the permit approval process and regulatory mandate of the Disposal Code.[35] In that regard, these day-to-day operational mandates amount to nothing more than the implementation by the State of its regulatory requirements.

■ Based on an analysis of the present case law and what meager legislative history is pertinent, the Court is convinced that certain factors should be considered in determining whether to impose operator status. The Court should inquire, inter alia, into whether the person sought to be strapped with operator status controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; was responsible for the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility, other than the payment or receipt of taxes. The recitation of these factors is not intended to be exclusive but only part of a para materia inquiry in determining operator status. Cf. Aceto, 872 F.2d at 1380 (CERCLA should be liberally interpreted). Also, operator status will not necessarily attach if any one of these factors is found to exist. Each case must be determined based upon the unique factual situation presented. Considering the totality of circumstances, this Court finds they do not mandate the imposition of operator status under CERCLA. That the State's regulatory program may or may not have been more expansive or exacting than another state's regulatory program should not be the basis for holding that the State of Delaware was an operator of the Site under CERCLA.

**35.** The Disposal Code, at section 38.4, entitled "Sanitary Landfill Standards" required, inter alia, as follows:

(b) Operational Requirements.

1. Ground and surface water protection. To ensure that no contact between refuse deposits and the ground water table occurs, at least two feet of separation between refuse deposits and the estimated high ground water table level shall be maintained. Surface water streams shall be kept a safe distance from the refuse fill, preferably over one thousand (1,000) feet. Operations should be planned so that rain water is drained off the fill at all times. Standing water shall not be allowed on the fill at any time. The completed fill shall have a minimum slope of 1% to facilitate surface drainage and a maximum slope that precludes erosion.

2. Compaction. Refuse shall be spread and compacted in shallow layers not exceeding a depth of two feet of compacted material. Every effort should be made to ensure the highest degree of compaction of the refuse. Individual refuse cells in sanitary landfills shall be no greater than eight feet in depth.

3. Frequency and depth of cover. A layer of suitable cover material shall be placed over all refuse as soon as possible after deposit and, at least, by the end of each working day. This layer shall be of such depth that when compacted it produces a cover layer of at least six (6) inches in depth. Final cover of suitable material—compacted to a minimum thickness of two feet—shall be placed over all completed areas or cells by the end of the working day on which the area or cell was completed. Daily and final depth of cover requirements may be increased when suitable cover material is not being utilized. Three feet of clearance shall be maintained between trenches when the trench method is used. Operations shall be planned so that the minimum possible amount of refuse material is exposed at any one time. Spraying exposed refuse with insecticides and/or deodorizers may be required when cover is not accomplished immediately.

\* \* \* \* \* \*

7. Completed sections. The entire surface of completed sections of the landfill shall be inspected on a regular basis following placement of the final, two foot, soil cover. All cracked, eroded, and uneven areas shall be promptly repaired.

It is apparent from these provisions that the Disposal Code contemplated an active regulatory role by the State in ensuring that solid waste disposal sites, such as Tybouts Corner, were maintained in the public interest. Indeed, section 38.41 of the Disposal Code states that "[s]anitary landfills shall be operated so as ... to preclude nuisances, health hazards, or potential health hazards." Section 38.42 states that "[a]ccident hazards, and potential for water pollution shall be minimized at sanitary landfill sites.... [and that] [p]otential nuisances and health hazards associated with completed fills shall be controlled."

While CERCLA may have broad legislative objectives, it must be remembered that "statutes have not only ends but also limits", *Edward Hines Lumber*, 861 F.2d at 157, and the limits of operator status do not encompass the actions taken by the State at Tybouts Corner.

This Court would be remiss in its responsibilities if it did not consider the recent decision of the Special Master in *Stringfellow*, No. CIV 83–2501 JMI (MX) (Order on Directed Verdict). The sole issue in *Stringfellow* was whether the State of California was a responsible party under section 107(a) of CERCLA. The Special Master found California to be liable under section 107(a) as an operator, as an owner and as an entity which arranged for treatment and disposal of hazardous substances. In particular, the Special Master stated that:

> Even if the State were considered an "involuntary" owner or operator of the facility (*see* § 101(20)(D)) its liability is unaffected since the State *caused and contributed to a release and threatened release of a hazardous substance* from the facility both before and after it became the owner and operator, including but not limited to its negligence in (i) investigating the site, (ii) choosing the site, (iii) designing the site, (iv) supervising construction of the site, (v) delaying taking cleanup activities at the site and (vi) failing to remedy conditions at the site.

*Stringfellow*, No. CIV 83–2501 JMI (MX) at 4–5 (emphasis added). In reaching that decision, the Special Master indicated several facts which, among others, led him to his conclusion. Among those facts are several items which are conspicuously missing in the instant case. California hired, directed and supervised the employees who had day-to-day operational responsibility for the Stringfellow site as well as set the responsibilities for these employees. *Id.* at 5–6. *Compare Edward Hines Lumber*, 685 F.Supp. at 657, *aff'd*, 861 F.2d 155 (summary judgment of no operator liability affirmed where "Hines has presented no evidence that Osmose ever ... exercised any control over the disposal of process run-off into the holding pond", 685 F.Supp. at 657;

"Osmose ... did not interfere with operational decisions.... Osmose had no control of the work at the Hines plant, no right to chose employees, direct their activities...." 861 F.2d at 158). Similar involvment by the State of Delaware cannot reasonably be inferred from the undisputed facts of this case, even when considered most favorably to the Third–Party Plaintiffs. It is, however, just such facts (also missing in the *Dart* case) that the Fourth Circuit considered important in determining the non-culpability of DHEC. *See Dart*, 847 F.2d at 146 ("However, there is no allegation that DHEC went beyond this governmental supervision and *directly managed Carolawn's employees or finances* at the Fort Lawn site."). In addition, there are other facts present in *Stringfellow* that cannot be reasonably inferred in this case. In *Stringfellow*, the State of California made a public announcement that it was and would be responsible for the site. In contrast, no such public admission by the State of Delaware is before the Court. Indeed, the denial of responsibility for the Site lies at the core of the State's arguments. There was also testimony in the *Stringfellow* trial, by two State of California employees with responsibility for the site that California "directed" and "controlled" the Stringfellow site. *Stringfellow, supra* at 7. Aside from the conclusory allegations of the Third–Party Plaintiffs which attempt to characterize the State's involvement at the Site as direct and controlling, the facts considered most favorably to the Third–Party Plaintiffs do not support such a characterization. Certainly there is no positive statement by State officials that the State directed and controlled the Tybouts Corner site. Unlike the Special Master's decision in *Stringfellow*, the actions taken by the State of Delaware at Tybouts Corner do not exceed "mere regulation" nor do they constitute "active, voluntary, 'hands on' participation in the day-to-day management and operations" of the Site. *Id.*

### B. *Arranger Status*

■ The State also argues that it is not liable under section 107(a)(3) of CERCLA

as an arranger for the disposal or treatment of hazardous wastes. The Third–Party Plaintiffs argue that such status is properly placed upon the party who has decision-making authority with respect to the place at which the waste is disposed. Furthermore, they argue that ownership or possession of the hazardous waste is not a prerequisite to arranger liability nor, they argue, is arranger status limited to the generator of the waste.

Section 107(a)(3) provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances" may be liable as a responsible party. 42 U.S.C. § 9607(a)(3) (1989 Pocket Part).[36] While CERCLA does not provide a definition for the term "arrange", several cases have attempted to give substance to liability as an arranger. *See generally* 2 S. Cooke, The Law of Hazardous Waste at § 14.01[5][d] (discussing liability under section 107(a)(3)). Congress did not, to say the least, leave the floodlights on to illuminate the trail to the intended meaning of arranger status and liability. *See Aceto,* 872 F.2d at 1380 and n. 8. It is fairly well settled, however, that the term should be given a liberal interpretation. *Id.*

The State urges the Court to adopt the holding in *State of N.Y. v. City of Johnstown, N.Y.,* 701 F.Supp. 33 (N.D.N.Y.1988). In that case the State of New York brought actions under sections 107(a)(1) and (2) and under section 107(a)(3) against two cities as owner and operator of two facilities. The defendant counterclaimed, alleging, *inter alia,* that the State of New York was a responsible party under section 107(a)(3) because it "otherwise arranged for" the disposal of hazardous substances. The basis for this allegation was that New York "either permitted or directed waste to be placed in the facilities." *Id.* at 36. The

court said that "[t]o establish liability under § 9607(a)(3), it must be shown, *inter alia,* that the State *owned* or *possessed* the hazardous substances of which it arranged to dispose." *Id.* (emphasis in original), *citing C. Greene Equipment Corp. v. Electron Corp.,* 697 F.Supp. 983, 986 (N.D.Ill. 1988); *Ward,* 618 F.Supp. at 893.

The defendant in *Johnstown,* as do the Third–Party Plaintiffs here, asserted that arranger liability is properly placed on the State. *Johnstown,* 701 F.Supp. at 36. They argued that "it is the party who decides to transfer substances that should be liable", *id., citing NEPACCO,* 810 F.2d at 743; *see also United States v. A & F Materials Co., Inc.,* 582 F.Supp. 842, 845 (S.D.Ill.1984); and that "the responsible party need not be the owner or possessor of the hazardous substances." *Johnstown,* 701 F.Supp. at 36, relying on *NEPACCO,* 810 F.2d at 743; *Bliss,* 667 F.Supp. at 1306–07 (E.D.Mo.1987); and *Mottolo,* 629 F.Supp. at 60.[37] The *Johnstown* court distinguished all of the cases relied upon by the defendant as involving a "responsible party [who] was either an officer or plant supervisor of a waste-producing corporation or a hired third party who decided how to dispose of its own waste." *Johnstown,* 701 F.Supp. at 36. The court continued, stating that:

> The above situations are much different from the one before the Court. The cases clearly show that there has to be *some nexus* between the allegedly responsible person and the owner of the hazardous substances before a party can be held liable under 42 U.S.C. § 9607(a)(3). *See Edward Hines Lumber Company v. Vulcan Materials Company,* 685 F.Supp. 651, 656 (N.D.Ill. 1988); *Jersey City Redevelopment Authority v. PPG Industries,* 655 F.Supp. 1257, 1260 (D.N.J.1987); *United States v. Conservation Chemical Company,* 619 F.Supp. 162, 241 (W.D.Mo.1985); *State of New York v. General Electric*

---

**36.** This quoted portion of the statute, taken from the amended version of the section, represents no change from the original version of the section.

**37.** These cases are also relied upon by the Third–Party Plaintiffs.

*Company,* 592 F.Supp. 291, 297 (N.D.N.Y.1984). There is no such nexus between the State and defendant here. The State was attempting to remediate the hazardous waste problems at both sites and cannot be considered in the class of liable parties along with Milligan & Higgins. The Court holds that the State of New York in this instance is not a person subject to the CERCLA contribution provision, 42 U.S.C. § 9613(f)(1). *Id.* (emphasis added).

This Court finds the reasoning of the *Johnstown* court to be persuasive. With the possible exception of the discussion in footnote 38, there are no facts or reasonable inferences that indicate the State of Delaware ever owned or possessed, either actually or in a constructive sense, any hazardous wastes that were disposed of at Tybouts Corner.[38] In this case, as in *Johnstown,* Third–Party Plaintiffs seek to hold the State as a responsible person because it permitted or directed wastes to be deposited at Tybouts Corner.[39] This Court agrees that to impose liability under section 107(a)(3), some nexus or relationship must be shown between the person alleged to be an arranger (here, the State) and the owner of the hazardous substance. *Id.; see also Florida Power & Light,* 18 Envt'l L.Rep. 20998; R. Hall, *State Role in Su-*

*perfund Enforcement* at 9–13 (1988), reprinted in II Environmental Litigation at 1175–1179 (1988) (ALI–ABA Course of Study Materials). For the reasons stated in *Johnstown,* the cases relied on by the defendant there, and the Third–Party Plaintiffs here, are distinguishable.

The Third–Party Plaintiffs also direct the Court's attention to the Eighth Circuit's decision in *Aceto,* 872 F.2d 1373. In *Aceto,* the court affirmed a District Court's decision to deny a motion to dismiss a complaint based on section 107(a)(3) arranger liability. The court opined that to grant the motion to dismiss would frustrate one of the "two essential purposes of CERCLA", *Aceto,* 872 F.2d at 1380, "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *Id., citing Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986). *See also supra,* S.Rep. No. 848 at 13. Refusing to read section 107(a)(3) narrowly, the court discussed several other cases where courts went "beyond [the] defendants' characterizations [of their activities] to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto,*

**38.** The undisputed fact that the State Highway Department trucks transported some amount of waste to the Site may, in the most liberal sense of construction, however, be construed to fit within section 107(a)(3)'s "possessed" language. This conclusion, however, does not require the Court to grant the Third–Party Plaintiffs' cross-motion on arranger status. *Raines,* 402 F.2d at 245. Viewed most favorably to the State, the record is simply not sufficiently developed with respect to this undisputed and unaddressed allegation. *See* D.I.1964A at A106, A81; *cf. Pettinaro Const. Co., Inc. v. Del. Authority, Etc.,* 500 F.Supp. 559, 563–64 (D.Del.1980); *see also* 6 Moore's Federal Practice § 56.17[10] at 56–418 (1989) ("questions of large public import should not be decided on an inadequate factual basis."). Accordingly, the Third–Party Plaintiffs' cross-motion in this regard must also be denied. The conclusions in this footnote are necessarily limited to the undisputed allegation discussed herein.

**39.** The Third–Party Plaintiffs attempt to distinguish *Johnstown* as a case in which New York's

involvment was limited to remediation efforts after there were known hazardous substances at the site. They argue that New York, "as part of its overall cleanup plan—directed those entities ... that had allegedly generated hazardous substances to dispose of them at the other Gloversville site." Letter dated July 10, 1989, pursuant to Local Rule 3.1(E) at 8. They argue that it was "only because the State was attempting to remediate the hazardous waste problems at the two sites" that the State was not liable. *Id.* In contrast, Third–Party Plaintiffs assert that Delaware "plainly 'arranged for' various companies to dispose of wastes at Tybouts Corner ... years before anyone's thoughts became focused on cleaning up the site. Because ... Delaware years ago made the precise sort of 'arrangements' that have resulted in the environmental problems", with which CERCLA is concerned, Delaware should be liable under section 9607(a)(3). *Id.* at 8–9.

The Court finds this distinction to be tenuous at best. Indeed, the case against New York appears to be a stronger one than the case against Delaware.

872 F.2d at 1381.[40] The court went on to reject the defendants' analogy to cases which "refused to impose liability where a 'useful' substance is sold to another party, who then incorporates it into a product, which is later disposed of." *Aceto,* 872 F.2d at 1381. Those cases were distinguishable because there was "no transfer of ownership of the hazardous substances" in *Aceto* and because the party upon whom the defendants' sought to impose liability actually undertook its activities "on products owned by the defendants for defendants' *benefit* and at their direction...." *Id.*

The Third–Party Plaintiffs assert that *Aceto* is significant for several reasons. First, it demonstrates the breadth of section 107(a)(3); second, that courts should, and do, look beyond a defendant's characterization of its activities in deciding on its liability; and, finally, that it is the authority to control disposal that is critical. This Court does not dispute the broad range of section 107(a)(3) nor does it dispute the necessity to look beyond a party's own characterization of its activities.

As to the final contention, that the State should be held an arranger because it had the authority to control the disposal of the toxic substances, it is rejected. In *NEPACCO,* the Eighth Circuit stated that they "believe requiring proof of *personal ownership* or *actual physical possession* of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42

U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA." *NEPACCO,* 810 F.2d at 743 (emphasis added). On the facts of both *NEPACCO* and *Aceto,* the Eighth Circuit's holding is on all fours with the statutory goals of CERCLA. In *NEPACCO* the court correctly noted that "construction of CERCLA to impose liability upon only the corporation and not the individual corporate officers and employees who are responsible for making corporate decisions about the handling and disposal of hazardous substances would open an enormous, and clearly unintended, loophole in the statutory scheme." *Id.* In *NEPACCO,* it was the plant supervisor who had *"actual 'control'* over the NEPACCO plant's hazardous substances." *Id.* (emphasis added). Indeed, if actual physical possession or personal ownership were a prerequisite, it would allow plant supervisors and corporate officers to escape section 107(a)(3) liability in many cases. The court agreed with the government that this actual control by the plant supervisor would allow the imposition of section 107(a)(3) liability because this actual control satisfied the "possessed" language of section 107(a)(3). The Eighth Circuit based its decision on what may properly be described as a constructive possession.[41] Of course, as a plant supervisor, the defendant in *NEPACCO* also had a commercial, financial relationship to NEPACCO.

While the Eighth Circuit reiterated this holding in *Aceto,* it did not base its result

---

**40.** In each of the cases cited by the court, interestingly enough, the party potentially liable as an arranger was a person or entity that had, to some degree, a commercial, financial or proprietary relationship to the hazardous waste disposal. *See State of N.Y. v. General Elec. Co.,* 592 F.Supp. 291 (N.D.N.Y.1984) (seller of used transformer oil containing PCBs); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162 (W.D.Mo.1985) (seller of lime slurry and fly ash byproducts used to neutralize and treat other hazardous substances); *A & F Materials Co.,* 582 F.Supp. 842 (manufacturer of jet aircraft arranged for disposal of spent aluminum etch caustic solution); *Ward,* 618 F.Supp. 884 (electrical equipment rebuilder and its corporate officer, director, principal shareholder arranged for disposal of transformer fluids containing PCBs); *State of Missouri v. Independent Petrochemical Corp.,* 610 F.Supp. 4 (E.D.Mo.1985) (successor corporation to predecessors who ar-

ranged to have dioxin removed from its property); *United States v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983) (generators of hazardous wastes).

**41.** This constructive possession is entirely consistent with the dictionary definition of "possessed." The plant supervisor, as one who had actual control over the hazardous substances was a possessor. *See, e.g.,* Webster's Third New International Dictionary 1770 (1981) ("possessor" defined as one that occupies, holds, owns *or controls;* "possess" defined, *inter alia,* as "4a to take into one's possession: seize *or gain control* of ... b: to enter into and influence powerfully *or control;"* and "possession" as "1a the act or condition of having in or taking into one's control...."; and "possessed" as "held as a possession ... influenced or controlled by something....") (emphasis added).

on its *NEPACCO*'s holding because the defendants in *Aceto* "actually owned the hazardous substances, as well as the work in process." *Aceto*, 872 F.2d at 1382. Thus, neither *NEPACCO* nor *Aceto*, when distinguished in this way, require this Court to find the State to be an arranger under section 107(a)(3). Nor are *NEPACCO* and *Aceto* inconsistent with this Court's decision that in order to characterize a CERCLA person as an arranger there must be some nexus or relationship between the person under attack and the actual owner or possessor of the hazardous substance. *See Johnstown*, 701 F.Supp. at 36; *A & F Materials*, 582 F.Supp. at 845. In the cases discussed above, this nexus or relationship was present due to the commercial relationship of the person fixed with arranger status (which in some instances was coupled with the actual control that person had over the hazardous wastes) and the hazardous wastes which were disposed.[42] The nexus or relationship could be shown, depending on the facts of a particular case, in many ways, all in keeping with the broad remedial objectives of CERCLA.[43] The State of Delaware was attempting to solve the problem of the safe disposal of wastes—some of which may be determined to be hazardous—a situation that is analogous to the State of New York in its attempt to remediate the hazardous waste problems at the sites in *Johnstown*. On the facts of this case, this is simply not the appropriate situation for the attachment of arranger status on the State. Accordingly, the Court holds that the State of Delaware was not a person who arranged for the disposal of hazardous wastes at Tybouts Corner under section 107(a)(3) of CERCLA.[44]

The cases relied on by the Third–Party Plaintiffs for the proposition that a state should not be exempted from CERCLA liability merely because it acted pursuant to its regulatory capacity miss the point. It is not the fact that the State was *regulating* the sites that compels the Court's conclusions that the State was not a covered person under sections 107(a)(2) and (3). Rather, the basis of these conclusions is that the level of the State's involvment at Tybouts Corner, which in this case was taken pursuant to its regulatory and statutory mandate, does not amount to sufficient activity to give rise to operator or

---

**42.** Such a relationship is certainly present in those cases where the arranger owned the hazardous substance, *see, e.g., Aceto*, 872 F.2d at 1382. It is also present in those cases where a corporate employee, such as a plant supervisor, was an arranger, *see, e.g., NEPACCO*, 810 F.2d at 743.

**43.** The Third–Party Plaintiffs also argue that the Special Master's order in *Stringfellow* mandates the imposition of arranger status on the State. *See* Letter to the Court dated October 27, 1989, pursuant to Local Rule 3.1(E). In *Stringfellow*, the Special Master found, *inter alia,* that:

On several occasions after Mr. Stringfellow had voluntarily closed the site, *the State [of California] independently arranged for* disposal and treatment of hazardous substances at the site, including but not limited to arranging for disposal of a leaking drum for a local fire department, a leaking barrel for a mosquito abatement district, ten one-gallon jugs for a plating company, and soil from Glen Avon containing hazardous substances *owned or possessed by the State* ....

*Stringfellow*, Special Masters order at 6 (emphasis added). As discussed earlier in this opinion, the *Stringfellow* case presented a much more egregious level of conduct by the State of California. The Third–Party Plaintiffs argue that the quoted language indicates that the arranger status can attach even to a person who did not own the waste and that it is the possession and exercise of "the *authority* to take an active role in 'arranging for' the disposal of wastes" that is relevant. Letter dated October 27, 1989, *supra*, at 3 (emphasis added). That position is rejected for the reasons stated in this opinion. *See, e.g.,* discussion of *Johnstown, NEPACCO* and *Aceto.* Furthermore, the quoted language from the *Stringfellow* case was part of the list of facts which were established to the satisfaction of the Special Master. It is, therefore, unclear whether the Special Master's decision to impose arranger status on California was based on the entire quoted language or only the emphasized portions or whether the quoted factual finding was merely one set of findings considered in imposing owner, operator and arranger liability. Finally, the quoted factual finding may not be at all inconsistent with this Court's reading of *Johnstown, NEPACCO* and *Aceto*, etc., because the "independent" arrangements made by California may supply the nexus or relationship that *Johnstown, NEPACCO* and *Aceto* indicate.

**44.** This conclusion is subject to the potential for arranger status discussed in footnote 38.

arranger status under CERCLA.[45] This Court does not hold that a governmental body is automatically foreclosed from CERCLA liability merely because it is acting in a regulatory capacity pursuant to statutory mandate. For example, if a state owned or operated a facility or deposited its own hazardous wastes at a facility it owned, the mere fact that it was also operating in a regulatory capacity would not necessarily mean that it would escape liability under CERCLA.[46] Indeed, such a conclusion would run counter to recent Supreme Court precedent. "Congress intended that States be liable along with everyone else for cleanup costs recoverable under CERCLA.... States [may] be liable in any circumstance described in § 107(a) from which they were not expressly excluded." *Pennsylvania v. Union Gas Co.*, 491 U.S. at ——, 109 S.Ct. at 2278.

To summarize, the Court has determined that the State is entitled to prevail, as a matter of law, on its motion for summary judgment based on the conclusions that its actions do not give rise to operator or arranger status under sections 107(a)(2) and (3) of CERCLA subject to the conclusions reached in footnote 38. In reaching these conclusions, the undisputed facts were considered most favorably to the Third–Party Plaintiffs. In disposing of the State's motion, all of the arguments raised by the Third–Party Plaintiffs in their cross-motion have also been addressed in accordance with *Hersh*, 789 F.2d at 232. Accordingly, the Third–Party Plaintiffs' cross-motion for summary judgment on *these* issues is denied.

### C. *Transporter Status*

█ The Third–Party Plaintiffs have asserted another basis upon which the State may be a potentially responsible party under CERCLA. Buried in a footnote to their Statement of Facts, the Third–Party Plaintiffs asert that the State Highway Department transported waste to the Site. There is no factual record indicating what type of wastes were transported or for whom the State Highway Department transported the wastes. D.I.1964A at A81, A106. After making this assertion, they cite section 107(a)(4) of CERCLA. D.I.1964 at 7 n. 3. This is the only place in the briefs where this is mentioned. Because the Third–Party Plaintiffs have not indicated whether this asertion is merely one of fact and/or a legal argument, the Court will view it as an argument that the State is liable as a transporter under CERCLA. The State has not disputed this argument. In fact, the State has not addressed it at all.

Section 107(a)(4) provides in part that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... selected by such person" may be a potentially responsible party under CERCLA. 42 U.S.C. § 9607(a)(4). There is a dearth of case law on this section; perhaps explaining why neither party has presented any legal argument on this theory. *See, e.g., Conservation Chemical*, 619 F.Supp. at 191; *NEPACCO*, 579 F.Supp. at 846–47. One commentator has said that:

The conduct which justifies the imposition of liability is the transportation to a facility that the transporter itself selected, presumably on the theory that such a party has actively involved itself in the process of storing or disposing of hazardous substances and should be made to share the cost of any resulting harm to the environment. A common carrier that

---

**45.** For the same reasons the Court must reject the Third–Party Plaintiffs' argument that the State did not merely leave its regulatory fingerprints on the Site and is therefore a potentially responsible party. As discussed throughout this opinion the Court does not see the situation as it is characterized by the Third–Party Plaintiffs, even giving all reasonable inferences to be drawn from the facts to them.

**46.** The Supreme Court has said that "[i]f States, which comprise a significant class of *owners*

*and operators* of hazardous waste sites ... need not pay for the costs of cleanup, the overall effect on voluntary cleanups will be substantial." *Pennsylvania v. Union Gas Co.*, 491 U.S. at ——, 109 S.Ct. at 2285. Thus, when a State *is,* in fact, an *owner or operator* of a facility or an arranger of the disposal of hazardous wastes, it clearly would be responsible under CERCLA; and the fact that it may have been doing so pursuant to state statute or regulation would not necessarily alter the situation.

merely delivers the substances to a location selected by another is not liable for releases at the facility, but is liable for any releases occurring during the period of transportation.

2 S. Cooke, The Law of Hazardous Waste at § 14.01[5][e] at 14–93.[47]

In viewing this argument, the Court must consider the facts and all reasonable inferences to be drawn therefrom most favorably to the State. *Hersh,* 789 F.2d at 232. The only factual assertion in support of transporter liability under section 107(a)(4) is that the State Highway Department transported some wastes to the Site. D.I.1964 at 7 n. 3. This undisputed fact, taken alone, is certainly not sufficient to grant the Third–Party Plaintiffs' summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Nor do the facts before the Court indicate that there is no genuine issue of any material fact. Accordingly, to the extent that the Third–Party Plaintiffs' assertion can be regarded as a motion for summary judgment on this issue, it is denied.

### V. CONCLUSION

The actions taken by the State at Tybouts Corner do not, with one possible exception, give rise to the attachment of operator or arranger status under sections 107(a)(2) and (3), respectively. The State's motion for summary judgment on the issues of its status as an owner or arranger under section 107(a)(2) and (3) of CERCLA is therefore granted except for the issue of the State's arranger status as discussed in footnote 38. The Third–Party Plaintiffs' cross-motion for summary judgment based on the issues of operator and arranger status under sections 107(a)(2) and (3) of CERCLA is denied. Third–Party Plaintiffs are not entitled to judgment as a matter of law with respect to the liability of the State as a transporter under section 107(a)(4) of CERCLA. Therefore, Third–Party Plain-

tiffs' motion for summary judgment on this issue is also denied.

---

**47.** It is generally accepted that, in order to find liability as a transporter under section 107(a)(4) of CERCLA, there must be a finding that the site was selected by the transporter. *See generally Jersey City Redevelopment Authority v. PPG In-* *dus.,* 18 Envt'l L.Rep. 20364–20366, 1987 WL 54410 (D.N.J.1987). The meager record before the Court on the issue of transporter liability of the State does not enable the Court to make such a finding.