FARM BUREAU MUTUAL INSURANCE COMPANY OF MICHIGAN v
PORTER & HECKMAN, INC

PORTER & HECKMAN, INC v CARRICO

Docket Nos. 171425, 171426. Submitted January 9, 1996, at Detroit. Decided December 27, 1996, at 9:15 A.M.

Farm Bureau Mutual Insurance Company of Michigan, as subrogee of David and Peggy Carrico, brought an action in the Lapeer Circuit Court against Porter & Heckman, Inc., alleging, among other things, that Porter & Heckman is liable under the Environmental Response Act, MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.*, for contribution toward the remediation costs of soil and groundwater contamination in the Carricos' residential real estate and in adjoining real estate owned by Robert A. and Arlene V. Smithson caused by a leak from the fuel oil tank of the Carricos' heating system on which Porter & Heckman had performed repairs. Porter & Heckman brought a third-party action against the Carricos, alleging liability by the Carricos for all claims brought by Farm Bureau against Porter & Heckman.

The Smithsons brought a separate action in the same court against the Carricos and Porter & Heckman, alleging, among other things, liability under the Environmental Response Act for the costs of the remediation of the contamination of their property. Porter & Heckman and the Carricos filed cross-claims, each side denying its liability and asserting liability by the other.

The court, Nick O. Holowka, J., consolidated the actions and granted partial summary disposition for Porter & Heckman, ruling that Porter & Heckman could not be held liable under the Environmental Response Act as an operator of a facility or as an arranger of the disposal of a hazardous substance. Farm Bureau and the Carricos appealed, and their appeals were consolidated by the Court of Appeals.

The Court of Appeals *held*:

1. Under MCL 299.612(1); MSA 13.32(12)(1), liability for the costs of response activity incurred as a result of a release of a hazardous substance from a facility is imposed on, among other persons, the owner or operator of the facility or a person that by contract arranged for the disposal of the hazardous substance. MCL

299.603(t); MSA 13.32(3)(t) defines "operator" as a person that is in control of or responsible for the operation of a facility. MCL 299.603(m); MSA 13.32(3)(m) defines "facility" as any area, place, or property where a hazardous substance has been released, deposited, stored, disposed of, or otherwise comes to be located.

2. In order to be liable as an "operator" under MCL 299.612(1)(a); MSA 13.32(12)(1)(a), a person must have had authority to control the operations or decisions involving the disposal of the hazardous substance or assumed responsibility or control over the disposal of the hazardous substance. In this case, the trial court correctly concluded that Porter & Heckman had not been an operator. No evidence was presented from which it could be inferred that Porter & Heckman had any authority to control, manage, or operate the fuel tank. Porter & Heckman was not involved in the purchase, sale, manufacture, transportation, or processing of the heating oil, nor did it possess the requisite authority to control the heating oil or the fuel tank.

3. The trial court correctly concluded that Porter & Heckman could not be held liable under MCL 299.612(1)(d); MSA 13.32(12)(1)(d) for arranging for the disposal of a hazardous substance. There was no evidence that Porter & Heckman's repair of the Carricos' heating system included any arrangement or representations other than those that were pertinent to repair, nor was there evidence from which it could be inferred that Porter & Heckman had authority to control the handling and disposal of the heating oil.

Affirmed.

ENVIRONMENT — ENVIRONMENTAL RESPONSE ACT — LIABILITY FOR COSTS OF RESPONSE ACTIVITY — OPERATORS — ARRANGERS OF DISPOSAL OF HAZARDOUS SUBSTANCES — HEATING-OIL FURNACE REPAIRS.

A repairer of a heating-oil furnace that is not given authority to control the disposal of heating oil or that assumes no responsibility or control over the disposal of heating oil does not incur liability under the Environmental Response Act as an operator of a facility or as an arranger of the disposal of a hazardous substance when heating oil leaks after repair and contaminates soil and groundwater (MCL 299.612[1][a],[d]; MSA 13.32[12][1][a],[d]).

*Gault, Davison, Bowers, Hill, Parker & McAra* (by *Frederick L. Schmoll, III*), for Farm Bureau Mutual Insurance Company of Michigan and David and Peggy Carrico.

*Collison & Collison, P.C.* (by *Jeffrey C. Collison* and *Lori A. Ittner*), for Porter & Heckman, Inc.

Before: GRIBBS, P.J., and MARILYN KELLY and WHITE, JJ.

WHITE, J. This is a suit under Michigan's Environmental Response Act (MERA) (Act 307), MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.*,[1] which arose after fuel oil stored in an above-ground tank connected to a residential furnace leaked, resulting in groundwater and soil contamination. The issue is whether defendant Porter & Heckman, Inc., a plumbing and heating repair business that serviced the furnace, was an "operator" of a facility[2] or an "arrange[r] for disposal"[3] of a hazardous substance under the MERA, such that it may be held liable for contribution[4] toward response costs incurred to remediate the contamination. The circuit court concluded that defendant neither operated the facility nor arranged for disposal of the fuel oil and granted defendant's motion for partial sum-

---

[1] The Legislature enacted the original MERA in 1982 and, in 1990, added extensive amendments, including the provision codified at MCL 299.612; MSA 13.32(12). In 1994, Public Act 451 recodified the MERA as Part 201 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.20101 *et seq.*, MSA 13A.20101 *et seq.*, and the recodified provisions took effect March 30, 1995. See *Cipri v Bellingham Frozen Foods, Inc*, 213 Mich App 32, 36; 539 NW2d 526 (1995), and Michigan Environmental Law Deskbook, vol I (1996 Supp), § 6.36, p 6-93.

[2] MCL 299.612(1)(a)-(c); MSA 13.32(12)(1)(a)-(c), quoted *infra*.

[3] MCL 299.612(1)(d); MSA 13.32(12)(1)(d), quoted *infra*.

[4] At the times pertinent to this suit, MCL 299.612c; MSA 13.32(12c) stated in pertinent part:

> (3) A person may seek contribution from any other person who is liable or may be liable under section 12 [quoted infra] during or following a civil action brought under this act.

mary disposition brought under MCR 2.116(C)(8) and
(10). Farm Bureau appeals, and we affirm.

I

Farm Bureau Insurance Company (plaintiff) is the
insurer and subrogee of the Carricos, who own prop-
erty in Columbiaville, Michigan. The Carrico home on
that property is heated by a furnace that uses oil; the
oil is stored in an outdoor, above-ground storage tank
that is connected to the furnace by a pipe. The tank
holds approximately 200 to 250[5] gallons of fuel oil.
Around the bottom of the fuel storage tank there is a
spigot-like portion that connects to a small steel can-
ister (the filter unit), within which sits a filter to trap
impurities. This filter unit, like the fuel storage tank,
is outdoors and is connected to the pipe that goes
into the Carrico house and furnace.

In its complaint, plaintiff, as the Carricos' subrogee,
sought legal and equitable relief and alleged common-
law negligence, malpractice, nuisance, violations of
Michigan's Environmental Protection Act, and viola-
tions of the MERA. It alleged that defendant was in the
business of supplying fuel to and servicing heating oil
tanks and that at all times relevant to this action the
Carricos contracted with defendant to supply and ser-
vice their above-ground heating oil tank. Plaintiff's

---

[5] On appeal, plaintiff alleges that the tank holds 270 gallons. This is not
a material fact for purposes of our review, but we note that the record
does not support that figure. Plaintiff's counsel stated at the motion hear-
ing that the tank held 200 to 250 gallons and cites that statement in sup-
port of the 270-gallon figure. Defendant attached to its appellate brief the
deposition testimony of the Clark Oil representative who testified that he
had been supplying the Carricos with fuel for a number of years. He testi-
fied that when he arrived at the Carricos on February 19, 1991, the tank
was "approximately half full," and had about one hundred gallons left in
it.

complaint further alleged that on January 7, 1991, defendant made a service call to the Carrico home in response to a complaint that the house was not being heated, and that, after discovering that the stoppage was due to ice that had formed in a filter bowl (i.e., the filter unit) attached to the heating oil tank, defendant's agent cleared the ice and installed a new filter, but did not install a new filter unit. The complaint alleged that because of ice expansion and corrosion of the filter unit, a hole had developed at the bottom of the filter bowl, which caused fuel oil to leak onto the ground, and that the leak caused extensive contamination of the Carricos' and an adjacent neighbor's properties.[6] Plaintiff alleged that the contamination threatened the environment, including a lake around which many people live, and that it had been forced to spend large amounts of money to determine the extent of the contamination, which was not yet clear.

Defendant's answer denied that it engaged in the business of supplying fuel. The answer admitted that on January 7, 1991, defendant replaced "the fuel filter which had become inoperative due to accumulation of water or condensation" within the heating oil tank, but that defendant did not replace the canister/filter unit because it was intact, was not leaking, and was functioning properly. Defendant denied that on January 7, 1991, the filter unit had a hole in it causing oil to leak out. Defendant's answer included a host of affirmative defenses.

---

[6] The adjacent neighbors are the Smithsons, whose case was consolidated with the instant case by stipulation below. The Smithsons are not parties to this appeal.

Defendant filed a third-party complaint against the Carricos, alleging that the Carricos were liable to defendant for all or part of the claims asserted against defendant, that the Carricos owed duties to owners of adjacent property that they breached by failing to inspect, test, or properly maintain heating equipment and its component parts, and that they failed to mitigate damages or take immediate corrective action.

In response to an interrogatory asking if the allegedly defective equipment had been examined, plaintiff responded that a corrosion engineer and a mechanical engineer had examined the unit in June and July 1991 and April 10, 1992, and opined that the release occurred through a pin-size hole in the bottom of the filter canister. Plaintiff's answers also stated that the defect in the filter unit manifested itself when the tank "needed to be refilled earlier than normal. It was at that time, February 19, 1991, that the leak was found." In response to an interrogatory asking plaintiff to state in detail what representations, if any, were made by defendant concerning mechanical repairs made, plaintiff responded that it had three invoices from defendant. Subsequent answers stated details about the three invoices. The first one was dated December 20, 1990, at which time no heat was being produced and defendant replaced the blower motor and v-belt; the second one was dated January 7, 1991, at which time no heat was being produced and defendant reset the electrodes and replaced a frozen fuel filter; and the third one was dated February 19, 1991, when defendant replaced the oil pump.

In subsequent interrogatories, plaintiff was asked to list all firms making fuel oil deliveries to the Carricos'

premises from January 1, 1989, through the date of the interrogatories. The Carricos answered by naming only Clark Fuel Oil. Plaintiff was also asked to state the date the furnace, tank, and component parts were purchased, along with the supplier and manufacturer, to which the Carricos responded, "I do not know when the furnace was purchased, it was in the house when I bought the house."

Defendant moved for summary disposition pursuant to MCR 2.116(C)(8) and (10), with respect to plaintiff's MERA claim only, arguing it could not be joined for purposes of contribution under the act because it did not fall within any of the classes of potentially responsible persons set forth at MCL 299.612; MSA 13.32(12), quoted *infra*. Defendant attached to its motion an affidavit of Larry Porter, defendant's president and co-owner, which averred that at all pertinent times defendant's business generally included plumbing repair, heating and cooling, and the sale of water-conditioning equipment; that defendant at no time undertook to provide the Carricos with fuel oil or any other hazardous substance for consumption or heating purposes;[7] that defendant at no relevant time arranged for disposal, treatment, or transport or engaged in the business of transporting fuel oil or any other similar hazardous substance; and that defendant at no relevant time had possession, ownership, or a possessory interest in either the Carrico or Smithson property.

Plaintiff's response to defendant's motion for summary disposition argued that a genuine issue of mate-

---

[7] Plaintiff's complaint had alleged that defendant supplied the Carricos with heating oil, but plaintiff dropped that allegation after defendant filed its motion for summary disposition.

rial fact existed regarding whether defendant may be liable as having "otherwise arranged for disposal" of the heating oil under the MERA, MCL 299.612(1)(d); MSA 13.32(12)(1)(d), quoted *infra*, and set forth the following factual statement:

> Around the first of January 1991, the Carricos noticed that the furnace which heated their residential dwelling at 721 Lakeshore Drive, Columbiaville, Michigan was not functioning. The furnace utilizes fuel oil for heat generation. The Carricos contacted Porter & Heckman, a company involved in the repair of furnace [sic] to come out and fix the problem. Unbeknownst to the Carricos, the canister [filter unit] housing the filter system attached to the fuel oil tank was damaged due to the freezing or excess water in the system. On January 7, 1991, Porter & Heckman's repair person replaced a frozen fuel filter on the Carrico's fuel oil tank. The repair person did not inspect nor [sic] replace the damaged canister housing. The water build up in the canister housing caused corrosion to the interior of the canister allowing fuel oil to flow out of the fuel oil tank. The leak was detected around February 19, 1991.
>
> Since discovery of the release, the Carricos and Farm Bureau have had to retain the services of environmental consultants to investigate the extent of the contamination caused by the release. During an initial excavation phase, approximately 420 cubic yards of soil were removed. Further investigations are continuing to fully define the extent of the remaining soil and groundwater [contamination] at the Carrico residence. [8]

---

[8] Defendant opposes plaintiff's factual statement on appeal. Plaintiff's initial appellate brief included a factual statement devoid of citations of the record, and some facts included in the brief were not presented in plaintiff's response to defendant's motion, although those facts were contained, to an extent, in answers to interrogatories contained in the lower court record. Plaintiff later filed a response brief to defendant's appellate brief, which included the same factual statement, but with citations of the hearing transcript on defendant's motion and of plaintiff's pleadings.

Defendant filed a response entitled "Appellee's Response to Appellants' Revised Statement of Facts," which argued that plaintiff's citations in sup-

port of its "amended" factual statement were citations either of plaintiff's counsel's statements at the hearing or of plaintiff's pleadings and argued that neither of these is evidence. Defendant further argued that a number of the factual statements were contradicted by the record.

On appeal, plaintiff's statement of facts expands on the February 1991 sequence of events, stating that during February 1991, the Carricos were again without heat and, thinking their fuel tank was empty, contacted a local supplier of fuel oil, Clark Fuel Oil and Gas Service, for their tank to be filled. A Clark representative came to the Carricos' house and noticed there was fuel oil left in the tank, topped off the tank, and suggested to the Carricos that they contact a heating repair person.

In excerpts of deposition testimony of one of defendant's employees, attached to defendant's appellate brief, the employee testified that on February 18, 1991, the employee and defendant's service manager went to the Carricos' house, after the Carricos complained to defendant's service manager of losing oil from the tank. The employee testified that they arrived and inspected the area surrounding the tank and saw no indication or evidence of a leak. They had brought five gallons of oil with them to test for leaks, and during that test they noticed a slight wetness on the bottom of the canister housing the filter. They shut off the oil supply valve and examined the canister, seeing a slight wetness in one bottom portion, which the employee described as a "minute spot," and although he testified that "there had to have been a leak there somewhere," he testified that the leak was not visible. He testified that they went back to the shop to pick up parts, that he returned to the Carricos' house later on the same day to replace the old canister unit, and that upon returning there was no evidence of leaking. He testified that he removed the oil line, removed the old canister, rebuilt the supply lines, screwed the new canister unit on, and turned on the supply valve, filled the unit back up with fuel oil, reconnected the supply line, bled the air off, and checked for leaks. The employee further testified that he returned to the Carricos' house on February 19, 1991, after the Carricos complained they had no heat. He discovered the oil pump had failed mechanically, went to the shop for parts, and returned that afternoon and replaced the oil pump. He testified that on the 19th he had to go outside to shut off the oil supply and that he neither observed nor smelled any leaking. He further testified that after replacing the oil pump, turning on the oil supply, and seeing no evidence of leaks, he restarted the furnace.

In excerpts of deposition testimony of the Clark Fuel Oil representative that delivered fuel oil to the Carricos, also attached to defendant's appellate brief, the Clark employee stated that he had delivered fuel oil to the Carricos since September of 1988 for Clark, and before that for another business, and that his last delivery was on February 19, 1991. He testified that he delivered one hundred gallons of oil on February 19 in response to a specific request by the Carricos for that amount, and that they had told him they were out of fuel oil and that he should deliver one hundred gallons. When he arrived and put one hundred gallons of fuel in the tank, he

could tell it had not been empty, and he advised the Carricos to get a furnace repair person. He further testified that when he made the delivery of fuel oil on February 19, 1991, he saw no evidence of any leaking. He testified that within a few days after February 19, Mrs. Carrico called him and told him the tank was leaking oil and asked if he could pump out the tank. He testified that by the time he arrived at the Carricos' house within four or five days of the 19th, the tank was empty and the oil had been absorbed by the snow.

Attached to defendant's second appellate brief, its response to plaintiff's amended statement of facts, is a letter to Farm Bureau from an engineering firm dated July 24, 1991, the subject of which is "Report on Corrosion of Oil Filter Canister" on the Carrico file. It states in part:

1. CONCLUSIONS

Leakage of oil has come from a pinhole in the bottom of the canister. The pinhole has been caused by internal corrosion pitting. Pitting is attributed to water from the bottom of the tank entering the filter and settling to the bottom of the canister.

The leak rate we measured was such that 150 gallons or so of oil could have been lost in a month's time.

2. TEST PROCEDURES

We visually examined the canister when we received it and could see no evidence of internal or external corrosion nor [sic] any pinholes. We next filled the can with water and noticed that dripping occurred from one point on the canister bottom. Upon wiping out the interior of the canister, we discovered pitting clustered about one area of the bottom. There was only one penetration, although there were several corrosion pits in the area near the penetration.

In order to simulate leakage under field conditions, we piped the filter up to a reservoir.

Thus, it is somewhat unclear exactly when the leak was discovered. There is also some inconsistency between the Clark Oil employee's testimony that he delivered one hundred gallons on February 19 to a tank that already had one hundred gallons in it, and that when he returned four or five days later, after being called regarding a leak, he found the tank empty, and the report's conclusion that the pinhole would allow the leakage of 150 gallons in a month's time.

Also attached to defendant's second appellate brief are excerpts from the Carricos' deposition testimony indicating that neither of them observed the leaking.

It is not clear that the canister was damaged as of January 7, 1991, although we review these allegations in the light most favorable to plaintiff. The repair person's deposition testimony was that, in addition to replacing the frozen filter, he inspected the canister carefully, by wiping it clean and shining a flashlight into it. He testified that he made sure that it

In its response to defendant's motion, plaintiff noted that there was no dispute that there had been a release of a hazardous substance at the Carricos' residence, which was a "facility" under the act, or that plaintiff had incurred response costs.

The Smithsons, who are not parties to this appeal, also opposed defendant's motion, arguing that defendant was either an "operator" under MCL 299.612(1)(b), (c); MSA 13.32(12)(1)(b), (c), or "otherwise arranged for disposal" under MCL 299.612(1)(d); MSA 13.32(12)(1)(d).

The parties relied on cases interpreting the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended, 42 USC 9601 *et seq.* The MERA is similar in intent to, and patterned after, the CERCLA; both provide for the identification of environmental contamination and for response activity to remediate it. *Flanders Industries, Inc, v Michigan,* 203 Mich App 15, 21; 512 NW2d 328 (1993). Both acts impose strict liability for cleanup costs on persons who fall within one of the enumerated categories of potentially responsible persons. MCL 299.612; MSA 13.32(12); 42 USC 9607(a). See Michigan Environmental Law Deskbook, vol I, § 6.43, pp 6-32, 6-33, and § 6-44, *Kelley v Thomas Solvent Co,* 727 F Supp 1532, 1539 (WD Mich, 1989), and *Nurad, Inc v William E Hooper & Sons Co,* 966 F2d 837, 841 (CA 4, 1992).

---

was "clean as a bell on the interior," and that it was sealed properly after he replaced the filter. He further testified that after he reassembled the unit, he checked for leaks.

In any event, defendant's motion addressed defendant's status under the MERA, not the validity of plaintiff's claims.

After hearing extensive argument from counsel at the hearing regarding defendant's motion, the circuit court stated its conclusions from the bench:

> The question presented in this particular motion simply refers to the Michigan Environment [sic] Response Act 307, in particular MCLA 299.601 et seq., whether Porter and Heckman is liable under that Act.
>
> Porter and Heckman claim that the intent of the statute is to place liability upon the owner or operator of the property where [sic] hazardous substance has been released or becomes otherwise located, claiming they didn't transport the contaminants and they don't have an ownership interest in the contaminated property. Porter and Heckman argue that the Act does not apply to them.
>
> Plaintiffs respond that the Act should be expansively construed to place the burden of clean-up on the parties responsible, for that party to arrange for the disposal.
>
> . . . [N]umerous cases have been submitted, most of them . . . deal with the Federal CERCLA Act which is similar to the state Act with some differences and they're the ones that interpret, they're the ones that are being relied upon by Counsel and this Court to interpret the state Act.
>
> In this particular situation, a release occurred of hazardous substances, that's not in dispute. Furthermore, the home of the Plaintiffs can be classified as a facility under the Act. The language, or otherwise arranged for the disposal, is not defined in the Act. While the Courts outside Michigan have interpreted the disputed language in different situations, it's up to this Court to determine how the language of the Michigan Act applies, not the Federal Act.
>
> Porter and Heckman came to the Plaintiff's residence to make repairs. It is alleged that these repairs were defective, thus causing contamination.
>
> At this point, based upon the case law submitted and the arguments submitted, the Court does not see that there was any disposal conducted by Porter and Heckman. The Court does not see that they arranged for the disposal of any property, or any contaminants. The Court does not see that they were the operator of this particular valve, and at this

point based upon the argument and the cases submitted, the Court has indicated the Court will grant the motion for partial summary disposition in regards to Act 307.

An order granting defendant's motion for partial summary disposition was entered for the reasons stated on the record. This appeal ensued.

II

To establish a prima facie case under the CERCLA, a plaintiff must show that (1) a release of hazardous substances has occurred, (2) at a facility, (3) causing a plaintiff to incur response costs, and (4) the defendant is a responsible party. *CPC Int'l, Inc v Aerojet-General Corp*, 777 F Supp 549, 570 (WD Mich, 1991), aff'd in part and rev'd in part on other grounds 59 F3d 584 (CA 6, 1995); *3550 Stevens Creek Associates v Barclays Bank of California*, 915 F2d 1355 (CA 9, 1990); *Hastings Bldg Products, Inc v Nat'l Aluminum Corp*, 815 F Supp 228 (WD Mich, 1993) (stating that "[p]rivate suits under CERCLA are those which are brought against responsible parties in order to gain reimbursement for response costs"); *Warwick Administrative Group v Avon Products, Inc*, 820 F Supp 116 (SD NY, 1993), aff'd in part, reversed in part, and remanded sub nom *United States v Cordova Chemcial Co of Michigan*, 59 F3d 584 (CA 6, 1995).

The MERA sets forth five categories of potentially responsible persons. MCL 299.612; MSA 13.32(12) states in pertinent part:

(1) Notwithstanding any other provision or rule of law and subject only to the defenses set forth in sections 12a and 12b, if there is a release or threatened release from a facility that causes the incurrence of response activity

costs, the following persons shall be liable under his section:

(a) The owner or operator of the facility.

(b) The owner or operator of the facility at the time of disposal of a hazardous substance.

(c) The owner or operator of the facility since the time of disposal of a hazardous substance not included in subdivision (a) or (b).

(d) A person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by the person, by any other person, at the facility owned or operated by another person and containing the hazardous substance.

(e) A person that accepts or accepted any hazardous substance for transport to the facility selected by that person.

The term "person" is defined as:

"Person" means an individual, sole proprietorship, partnership, joint venture, trust, firm, joint stock company, corporation . . . or any other legal entity. [MCL 299.603(w); MSA 13.32(3)(w).]

The terms "owner," "operator," and "facility" are defined in pertinent part as:

"Owner" means a person that owns a facility. Owner does not include [six exceptions are listed, none of which is at issue here]. [MCL 299.603(u); MSA 13.32(3)(u).]

"Operator" means a person that is in control of or responsible for the operation of a facility. Operator does not include any of the following [six exceptions are listed, none of which is alleged to apply here]. [MCL 299.603(t); MSA 13.32(3)(t).]

"Facility" means any area, place, or property where a hazardous substance has been released, deposited, stored, disposed of, or otherwise comes to be located. [MCL 299.603(m); MSA 13.32(3)(m).]

The CERCLA's provisions are analogous.[9]

_____

[9]

The comparable CERCLA provisions provide:

> (a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States Government or a State . . . . [42 USC 9607.]

The term "person" "means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity . . . ." 42 USC 9601(21). The term "owner or operator" is defined at § 9601(20), in pertinent part, as:

> (ii) in the case of an onshore facility . . . any person owning or operating such facility . . . . Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the . . . facility.       .

The term "facility" is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use . . . ." [42 USC 9601(9)].

III

Plaintiff's first argument on appeal is that defendant is liable under the MERA as an "owner or operator of the facility," MCL 299.612(1)(a); MSA 13.32(12)(1)(a), and that to establish "operator" liability it is the authority to control the facility that houses the hazardous substance that must be established, and not the authority to control the hazardous substance. We first observe that plaintiff did not assert that defendant was an owner or operator in its brief in response to defendant's motion; the brief argued only in favor of arranger liability. Counsel briefly addressed the operator issue during argument, referring to it as "Mr. Smithson's argument," and volunteering that the focus should be on the system and not the hazardous substance.[10] The circuit court ruled on this issue only because it was raised by the Smithsons. In any event, we are not persuaded that defendant is an owner or operator under the statute.[11]

---

[10] Counsel stated:

> With regard to the issue of operator, I only want to say this, *that's Mr. Smithson's argument*, and Don Hadden [counsel for the Smithsons below] will argue their position.

> The statement that in order to be an operator you have to have the right, or the ability, or the authority to control the hazardous substance, I think absolutely misses the point. The issue here is the ability, if you will, to control the system which controls the hazardous substance. In this particular instance they had not only the authority, they had the ability to control the system. They had the ability to remedy the defect, or to protect against the very defect which delivered the hazardous substance into the environment. [Emphasis added.]

[11] We note as well that plaintiff relies on MCL 299.612(1)(a); MSA 13.32(12)(1)(a), while the Smithsons relied on subsections b and c. Subsection a, however, is clearly inapplicable. The terms "owner" and "operator" are defined under the MERA in the present tense, see MCL 299.603(t)-(u); MSA 13.32(3)(t)-(u). MCL 299.612(1)(a); MSA 13.32(12)(1)(a) states

It is undisputed that defendant has never had an ownership interest in the property or the facility. The question is whether defendant is an operator under the statute. Because the scope of "operator" liability under MCL 299.612(b) or (c); MSA 13.32(12)(1)(b) or (c) has not been addressed by a Michigan state court, we look to federal case law interpreting similar issues under the CERCLA for guidance. See *Haworth, Inc. v Wickes Mfg Co*, 210 Mich App 222, 227-228; 532 NW2d 903 (1995), and *Flanders, supra* at 21.

Plaintiff first observes that "operator" has been defined as one with authority to control. This is correct. *Nurad, supra* at 841-844. We also accept plaintiff's contention that the focus is not simply on the authority to control the hazardous substance, but the facility. The *Nurad* court focused on "authority to control the operations involving the disposal of hazardous substances." The *Nurad* court determined that

---

that liability for incurrence of response activity shall attach to "the owner or operator of the facility." We thus interpret this provision as applying to *current* owners or operators of a facility. This interpretation is consistent with MCL 299.612(1)(b) and (c); MSA 13.32(12)(1)(b) and (c), the remaining "operator" provisions, in that they apply to noncurrent operators; provision b applies to operators of the facility at the time the disposal occurred, i.e., former operators, and provision c to operators of the facility since the time of disposal of the hazardous substance. Our interpretation is also in accord with decisions interpreting the analogous CERCLA provision, § 9607(a)(1), which, although worded in the conjunctive, has been interpreted as applying to current owners and operators, generally meaning the individual or entity owning or operating the facility at the time a lawsuit is brought. *Kerr-McGee Chemical Corp v Lefton Iron & Metal Co*, 14 F3d 321, 325 (CA 7, 1994) (interpreting § 9607(a)(1) as written, in the conjunctive); *United States v Fleet Factors Corp*, 901 F2d 1550, 1554 (CA 11, 1990) (interpreting provision in the disjunctive, as applying to either current owners *or* current operators); *Tanglewood East Homeowners v Charles-Thomas, Inc*, 849 F2d 1568, 1572 (CA 5, 1988) (applying provision to present owner of property previously contaminated, apparently applying disjunctive interpretation); *New York v Shore Realty Corp*, 759 F2d 1032, 1044 (CA 2, 1985) (applying provision to all current owners and operators).

the district court erred in finding that the "facility" was confined to the underground storage tanks (USTS) where hazardous substances had been stored, but also rejected the plaintiff's argument that the entire site was the "facility." *Id.* at 842-843. The court noted that, under § 9601(9), the only area where hazardous substances had "come to be located" was in and around the storage tanks:

> The fact that those tenants may have had control over a building that was adjacent to the USTS is irrelevant under the statute; a defendant operates a "facility" only if it has authority to control the area where the hazardous substances were located. Thus, while liability under § 9607(a)(2) is strict, it nonetheless extends only to those who have authority over the area where hazardous substances are stored. The statute places accountability in the hands of those capable of abating further environmental harm, while Nurad's proposed definition of "facility" would rope in parties who were powerless to act. [*Id.* at 843 (citation omitted).]

Under *Nurad,* we conclude that while the focus is on the facility, an "operator" of the facility must have authority to control the operations or decisions involving the disposal of the hazardous substance. That defendant here was called to service the Carricos' furnace, which was not producing heat, and at that time allegedly did not detect a pinhole in the filter bowl when checking the filter unit, does not render defendant a person with authority to control the Carricos' furnace system and fuel storage tank. One who services a system does not automatically control the operation of the system.

Plaintiff also cites *Kaiser Aluminum & Chemical Corp v Catellus Development Corp,* 976 F2d 1338,

1341 (CA 9, 1992), for the proposition that "operator" liability attaches to the party that had "authority to control the cause of the contamination at the time the hazardous substances were released into the environment." In *Kaiser*, Catellus' predecessor sold land to the City of Richmond. The City of Richmond hired an excavator, Ferry, to excavate and grade a portion of the land for a proposed housing development. *Id.* at 1339. The City of Richmond later sued Catellus to recover part of the cost of removing contaminated soil from the property, and Catellus filed a third-party complaint against Ferry for contribution under the CERCLA. *Id.* at 1340. Catellus alleged that Ferry performed excavation, dredging, filling, grading, and other construction and demolition operations on the property in 1982. Catellus alleged that in the course of these operations, Ferry mixed substances, which plaintiff alleged were contaminants, with soil and other fill materials, and then dispersed the resulting mixture throughout portions of the property. *Id.* at 1342, n 6.

The district court concluded that Ferry was not a person who could be held liable under § 9607(a) and dismissed Catellus' complaint for failure to state a claim. *Id.* at 1342. The Ninth Circuit Court of Appeals reversed, concluding that Catellus alleged facts sufficient to state a claim against Ferry under § 9607(a)(2), on the ground that Ferry was the operator of a facility, i.e., the development site, at which it disposed of hazardous substances. Noting that the activity that produced the contamination—the excavation and grading of the development site—occurred during the construction process, the court concluded that "Catellus's allegations of Ferry's operations on

the property tend to show that Ferry had sufficient control over this phase of development to be an 'operator' under section 9607(a)(2)." *Id.*

The *Kaiser* court also discussed the potential "operator" liability of contractors, and interpreted a case involving contractor liability, *Edward Hines Lumber Co v Vulcan Materials Co,* 861 F2d 155 (CA 7, 1988), as reiterating the "well-settled rule that 'operator' liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser, supra* at 1341, citing *Nurad, supra* at 842.

In *Hines,* the owner of a plant at which wood was preserved brought suit against a contractor, Osmose, who had designed and built another wood-treatment plant, trained the plaintiff's employees to operate the machinery, licensed the plaintiff to use its trademark in connection with treated wood, and supplied the plaintiff with the toxic chemical. The plaintiff promised to buy from Osmose its next five years' requirements of chromated copper arsenate, which makes wood suitable for prolonged exposure to the elements if treated properly. *Id.* at 156. The plaintiff also gave Osmose "full and immediate access to the plant and to all chemical processes and products located thereon or produced thereby for the purposes of insuring quality control according to the OSMOSE standards." *Id.* Osmose promised to construct a system that would prevent the escape of the toxic preservative, and built the plant on a concrete platform, which would better trap any leaking chemicals. The plaintiff operated this plant for two years until 1978 and then sold it to another corporation. In 1981, toxic sub-

stances, including chromated copper arsenate, were found in the groundwater. The Environmental Protection Agency asked the plaintiff and the successor corporation to remove the chemicals, and the plaintiff then filed suit seeking contribution from suppliers of wood-preserving chemicals, including Osmose. The Seventh Circuit Court of Appeals affirmed the district court's grant of summary judgment in Osmose's favor, expressing reasoning that is instructive in the instant case:

> Osmose designed and built the plant, furnished the toxic chemical, trained Hines's employees, and reserved a right to inspect ongoing operations. This must be enough, Hines submits, to make Osmose an "operator" within the meaning of the Superfund Act. It is easy to see the attraction of sweeping Osmose into the category of responsible persons. Since the facts and inferences must be taken favorably to Hines, the party resisting the motion for summary judgment, we must assume that Osmose came up with a defective design, did not build the plant to standard, trained Hines's employees poorly in how to control the toxic chemicals, and hid all of this from the management at Hines and its successor Mid-South so that they omitted steps that could have rectified the problem sooner and cheaper. . . . The prospect of liability under CERCLA would induce a firm in Osmose's position to take greater care in design, construction, and training, all of which would be beneficial . . . .
>
> It is not our function to design rules of liability from the ground up, however. We are enforcing a statute rather than modifying rules of common law. Osmose surely was not an "owner" of the Mena site, so it is potentially liable only if it was an "operator." The statute does not fix liability on slip-shod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on-the-job training—and the fact that Osmose might have been all four rolled into one does not change matters. The liability falls on owners and operators; architects, engineers, construction contractors, and instructors must chip in only to the extent that

they have agreed to do so by contract. To the point that
courts could achieve "more" of the legislative objectives by
adding to the lists of those responsible, it is enough to
respond that statutes have not only ends but also limits.
[861 F2d 157 (emphasis added).]

We conclude that neither *Kaiser* nor *Hines* sup-
ports plaintiff's position. As in *Nurad*, the defendants
in *Kaiser* and *Hines* were required to have authority
to control the operation or process by which the con-
tamination occurred. The *Kaiser* court determined
that operator liability may attach by virtue of the
defendant's extensive operations on the property
showing sufficient control over the construction pro-
cess during which the contamination occurred. In
fact, the defendant actually performed the operations
that caused the contamination. In *Hines*, the court
looked to the defendant's lack of control of the work
at the plant and its day-to-day operations.

Defendant's involvement and authority in the
instant case is not comparable. For purposes of this
appeal, we accept as true plaintiff's version of the
facts, i.e., that a leak existed when defendant serviced
the filter system on January 7. Defendant is not, how-
ever, rendered an operator simply because it failed to
take action that might have prevented the contamina-
tion. *Hines* makes this clear. Defendant is in the busi-
ness of plumbing and heating. The Carricos called
defendant to service their furnace system. Defend-
ant's authority, which was temporary and very short-
term, extended to inspecting and repairing the fur-
nace in response to the January 7 and February 18 or
19 calls. There is no evidence of a written contract or
agreement granting defendant general authority to
operate and control the furnace system or fuel oil.

Defendant's authority and control were not that of an operator, but of a service company called to inspect and repair in response to a specific complaint. Further, there is no evidence that any operation of the system by defendant caused the leak and contamination or that defendant had control over the system as the oil was leaking and causing the contamination.

Plaintiff next cites *United States v Northeastern Pharmaceutical & Chemical Co, Inc (NEPACCO)*, 810 F2d 726 (CA 8, 1986), for the proposition that a defendant need not own or possess the hazardous substance at issue to be liable under the CERCLA. Although this case does assert the proposition plaintiff relies on, that in order to be an owner or operator, one need not own or possess the hazardous substance involved, it does not support plaintiff, in that the court required that authority to control the disposal and handling of the hazardous substance be shown before extending liability. *Id.* at 743.

Plaintiff also cites *United States v Consolidated Rail Corp*, 729 F Supp 1461 (D Del, 1990), a case involving § 9607(a)(2) and (3), where several of the defendants, after being sued by the United States under the CERCLA, sought indemnification or contribution from a third-party defendant, Burke-Parsons-Bowlby Corp. (BPB). The court rejected the third-party plaintiffs' arguments, and granted BPB's motion for summary judgment, concluding that BPB was not an operator of the involved facility under § 9607(a)(2):

> "[T]he term 'owner or operator' means . . . any person who owned, operated, or otherwise controlled activities at such facility . . . ." Only those who "actually operate or exercise control over the facility that creates an environmental risk can be held liable under CERCLA for the costs of

reducing that risk." *Edward Hines Lumber Co v Vulcan Materials Co*, 685 F Supp 651, 657 (ND Ill, 1988) [aff'd 861 F2d 155 (CA 7, 1988)].

Although interpreted broadly, the statute requires that a person be actively participating in the management of the facility to be held liable for the disposal of hazardous wastes. [729 F Supp 1467-1468.]

This case provides no additional support for plaintiff's position.

Defendant cites *Stilloe v Almy Bros, Inc*, 782 F Supp 731 (ND NY, 1992), for the proposition that in order for "operator" liability to attach, there must be a nexus between a defendant and the hazardous substance, or control thereof. We agree.

In *Stilloe*, the plaintiff property owner had brought suit under the CERCLA, alleging that the defendant New York State Department of Environmental Conservation (DEC) was an "operator" of a facility and thus a potentially responsible party. The DEC moved for summary judgment, arguing that it was entitled to immunity and its only connection to the hazardous waste site at issue resulted from its remedial cleanup efforts. The district court initially denied the DEC's motion to dismiss, relying heavily on a statement in *CPC Int'l, Inc v Aerojet-General Corp (Aerojet)*, 731 F Supp 783 (WD Mich, 1989), also a case involving a governmental defendant that invoked immunity, that "where a party assumes control of an activity and then fails to perform, that party should bear the responsibility for any pollution which results." 782 F Supp 733, citing *Aerojet, supra* at 788.

On reconsideration, the *Stilloe* court abandoned its adherence to *Aerojet*:

Having now had the opportunity to review the facts of *Aerojet* in light of [several subsequent decisions], this court finds that DEC's activities are sufficiently different from those of the Michigan Department of Natural Resources ("MDNR") in *Aerojet* to render that decision inapposite. In *Aerojet*, MDNR entered into a contract with the owner of a hazardous waste site under which MDNR assumed responsibility to operate groundwater purge wells to help reduce pollution and improve waste disposal at the site. *See Stilloe*, 759 F Supp at 102-03. In *Aerojet*, this contract provided the nexus between the owner of the property and MDNR by establishing an ongoing relationship. Here there is no such nexus. Nor do Stilloe or Almy Brothers allege that DEC took control of the site for any reason other than to perform its statutory responsibility to clean up the site. Accordingly, the court now concludes that *Aerojet* does not provide a basis for holding that under the circumstances of this case DEC is an operator within the meaning of CERCLA. [782 F Supp 733.]

The *Stilloe* court dismissed the DEC on reconsideration, noting that the DEC's handling of hazardous waste barrels during cleanup activities, which barrels broke open while being moved, did not, standing alone, rise to the level of "operator" activity:

[N]either Stilloe nor Almy Brothers allege that DEC had any nexus to the site other than by reason of its remedial clean-up activities . . . .

Even if . . . DEC's physical handling of the hazardous waste during its clean-up activities resulted in damage to plaintiff, this activity, without more, does not convert DEC into an operator within the meaning of CERCLA. Stilloe as well as Almy Brothers may very well have claims against DEC, but they are not CERCLA claims. Rather, any claims that they might have against DEC for its handling of the clean-up effort are state law tort claims which section 107(d)(2) specifically does not preclude. [782 F Supp 736.]

Although involving a governmental immunity arguments, the *Stilloe* court's decision on reconsideration is instructive. Where the defendant's nexus to the site of the hazardous substance is attenuated or limited— e.g., there is no ongoing contractual relationship between the defendant and the property owner, or the activity being performed is limited in nature—the requisite authority to control is not established, and operator liability may not be imposed.

We agree with defendant that *Nurad, Stilloe, NEPACCO, Catellus,* and *Aerojet* require that in order for operator status to apply, a defendant must have had authority to control the operations or decisions involving the disposal of the hazardous substance, or assumed responsibility or control over the disposition of the hazardous substance, and we conclude that these cases do not support imposition of operator liability on defendant under the MERA.[12] The only connec-

---

[12] Defendant asserts that a particularly helpful case regarding both "operator" and "arranger" liability is *United States v New Castle Co,* 727 F Supp 854 (D Del, 1989). Defendant argues, and we agree, that the *New Castle* court stated that the clear language of the CERCLA imposes liability upon those who actually operate or control a "facility" under the statute. *New Castle* involved Tybouts Corner, a site envisioned as a model landfill that would be regulated by the State of Delaware under a then newly enacted Solid Waste Disposal Code. *Id.* at 862. Because the site was to be a model, the state involved itself in the site selection, planning, design, operations, and determination of suitable types of wastes for disposal. As part of the permit approval process, the state required the submission of detailed information about the site, its surrounding area, and proposed operational procedures, in order to ensure to the greatest extent possible that approval would be given to sites that were designed and operated to be environmentally safe. The state argued that the language of § 107(a) of the CERCLA plainly indicates that the state is not a potentially responsible party, and that the mere granting of permits, and regulatory actions, does not rise to the level of actions of an operator or one who arranges for the disposal of hazardous wastes. *Id.* at 864. The *New Castle* court noted that the CERCLA definition of "operator" gives little guidance to the courts and concluded, after analyzing a number of cases, including *NEPACCO, supra,* that " '[m]ere ability to exercise control as a result of the financial rela-

tion defendant is alleged to have with the Carricos' fuel tank is having been called to repair it. Plaintiff presented no evidence from which one could infer that defendant had any authority to control, manage, or operate the fuel tank as contemplated under the MERA. Defendant was not involved in the purchase, sale, manufacture, transportation, or processing of the heating oil, nor did defendant possess the requisite authority to control the heating oil or the fuel tank. Defendant's activities in this case were limited to taking action to remedy specific problems when called to do so and are too remote to rise to the level of operator liability. Even assuming that defendant was negligent in failing to discover a leak, and that by failing to take further action defendant failed to prevent the contamination, defendant still did not operate the facility.

We conclude that cases interpreting the MERA's analog, the CERCLA, do not support extension of liability to defendant under the circumstances presented here. A defendant's involvement or activities vis-à-vis the hazardous substance at issue must rise to a certain level to invoke operator liability. Absent either actual ownership or possession of a facility, a nexus must

---

tionship of the parties is insufficient for liability to attach. The entity [or person sought to be strapped with liability] must actually exercise control,'" *New Castle, supra* at 866, quoting *Rockwell Int'l Corp* v *IU Int'l Corp*, 702 F Supp 1384, 1390 (ND Ill, 1988), and that this "'does not include the designer or builder of a manufacturing system at a site containing the facility.'" *New Castle, supra* at 866, quoting *Edward Hines Lumber Co* v *Vulcan Materials Co*, 685 F Supp 651, 657 (ND Ill, 1988). The *New Castle* court distinguished the case before it from cases in which liability "was asserted against a person who had commercial, financial or proprietary interests at stake in relation to the hazardous substance" and noted that the state "did not participate or have the ability to control the Site with any proprietary or financial [or commercial] interests at stake." 727 F Supp 866.

exist between the defendant and the facility by which the defendant has assumed responsibility for, or managed, or had authority to control, or controlled, the operations involving the disposition or handling of the hazardous substance. We conclude that defendant's repair activities on the Carricos' furnace system do not rise to that level and that the circuit court properly dismissed claims of operator liability.[13]

IV

Plaintiff last argues defendant is liable as one who "otherwise arranged for disposal" of a hazardous substance, i.e., the fuel oil that leaked from the Carricos' fuel storage tank. Plaintiff relies on *Florida Power & Light Co v Allis Chalmers Corp*, 893 F2d 1313, 1318 (CA 11, 1990), for the proposition that such liability may be imposed on persons without active involve-

---

[13] Plaintiff also argues that the circuit court's ruling ignored the driving force behind the MERA and the CERCLA that response costs are charged to persons who caused contamination, and that defendant is liable "because it caused contamination." Plaintiff at one point argues in this regard that defendant should be held responsible for response costs, "not necessarily because it had authority over the tank or the fuel oil, but simply because its negligence caused contamination."

Case law is legion stating that under the CERCLA a plaintiff *must* establish that a defendant falls within one of the categories of potentially responsible persons. *3550 Stevens Creek Associates v Barclays Bank of California*, 915 F2d 1355 (CA 9, 1990); *Hastings Bldg Products, Inc v Nat'l Aluminum Corp*, 815 F Supp 228 (WD Mich, 1993) (stating that "[p]rivate suits under CERCLA are those which are brought against responsible parties in order to gain reimbursement for response costs"); *Warwick Administrative Group v Avon Products, Inc*, 820 F Supp 116 (SD NY, 1993), aff'd in part, rev'd in part, and remanded sub nom *United States v Cordova Chemical Co of Michigan*, 59 F3d 584 (CA 6, 1995). Plaintiff cannot circumvent this prima facie requirement by broad-brush references to legislative histories. The *CPC Int'l* case, which clearly states this prima facie requirement, is one of the cases plaintiff relies on to support its argument that defendant is liable because it caused contamination.

ment in the timing, manner, or location of the hazardous waste disposal.

In *Florida Power*, the plaintiff purchaser and recycler of PCB-contaminated electrical transformers brought suit for contribution against manufacturers of the transformers, alleging that the manufacturers "arranged for" the disposal of hazardous substances under § 9607(a)(3). *Id.* at 1317. The plaintiff had, after purchase, utilized the transformers in the course of business for about forty years and then sold them to a third company as scrap. *Id.* at 1315. During that company's reclamation process, its site was contaminated. The court noted:

> Whether an "arrangement for" disposal exists depends on the facts of each case. If a party merely sells a product, without additional evidence that the transaction includes an "arrangement" for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed. [*Id.* at 1317.]

The Eleventh Circuit Court of Appeals affirmed the district court's grant of summary judgment to the manufacturers, noting that the plaintiffs had not met their burden of demonstrating that the transactions involved were anything more than a sale, and that nothing in the record supported an inference that the manufacturers arranged for the disposal of hazardous waste by selling the transformers. *Id.* at 1319. While active involvement in the disposal is not essential, as in *Florida Power*, plaintiff here failed to otherwise establish arranger liability.

Plaintiff's reliance on *NEPACCO, Consolidated Rail,* and *Burlington Northern R Co v Woods Industries, Inc,* 815 F Supp 1384 (ED Wash, 1993), is also misplaced. Although the *NEPACCO* court did note

that actual ownership or possession of the hazardous substance is not a requisite to "arranger" liability, 810 F2d 743, it expressly stated that authority to control the handling and disposal of the hazardous substance "is critical under the [CERCLA] statutory scheme."[14] Plaintiff cites *Consolidated Rail* as supporting the proposition that "arranger" liability is imposed on parties responsible for disposal whether or not they generated the hazardous substances, but ignores that the court in that case relied on *NEPACCO's* "authority to control" test:

> The inquiry under section 9607(a)(3) turns on the determination of who made the crucial decision to dispose of hazardous substances under the Act, and thus falls within the class of responsible persons described in section 9607(a)(3). "It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." *NEPACCO*, 810 F2d at 743. [729 F Supp 1469 (additional citations omitted).]

---

[14] In *NEPACCO, supra,* the court also discussed individual liability under the CERCLA for any person who arranged for the disposal or transportation for disposal of hazardous substances. The Eighth Circuit Court of Appeals rejected a defendant's argument that he could not be held individually liable because he did not personally own or possess the hazardous substances. 810 F2d 743. The court agreed with the government that as NEPACCO's plant supervisor, the defendant had *actual control* over the hazardous substances and thus "possessed" the hazardous substances within the meaning of § 9607(a)(3). The court noted:

It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme. The district court found that Lee, as plant supervisor, actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal of the NEPACCO plant's hazardous substances at the Denney farm site. We believe requiring proof of personal ownership or actual possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 USC § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA. [*Id.* at 743.]

Although the *Burlington Northern* court did state, as plaintiff argues, that ownership of the hazardous substance is not an essential element under § 9607(a)(3), the test the court relied on and applied was the "authority to control" test of *NEPACCO*. 815 F Supp 1392.

Another case plaintiff cites for the proposition that one need not have ownership or possession of the hazardous substance to be liable under the CERCLA, *United States v Aceto Agricultural Chemicals Corp*, 872 F2d 1373 (CA 8, 1989), does not support "arranger" liability here. The plaintiffs in *Aceto* alleged that six defendants were liable under the CERCLA because they "arranged for" the disposal of a hazardous substance by contract, agreement, or otherwise when they contracted with Aidex Corporation, which operated a pesticide formulation facility, to formulate (mix) their technical grade pesticides into commercial grade pesticides. *Id.* at 1375, 1378. The plaintiffs alleged that the generation of wastes containing hazardous substances was an inherent part of the formulation process, that the defendants retained ownership of their pesticides throughout the formulation and packaging process, and that Aidex in fact generated such wastes and disposed of them on the Aidex site. *Id.* at 1378. The district court held that the plaintiffs' allegations were sufficient to hold the defendants liable as having "arranged for" the disposal of hazardous substances.

On appeal, the defendants argued that Aidex was hired to formulate, and not to "dispose," and that Aidex, not they, owned the hazardous waste and made the decisions regarding how it would be disposed of or treated, and by whom. *Id.* at 1379. The

defendants also argued that the plain meaning of the statute requires an intent to dispose of some waste, or, at the very least, the authority to control the disposal process, and that plaintiffs alleged neither. The Eighth Circuit Court of Appeals rejected the defendants' arguments, and affirmed the denial of the defendants' motion to dismiss, noting that there was no transfer of ownership of the hazardous substances, because the defendants retained ownership throughout:

> Aidex is performing a process on products owned by defendants for defendants' benefit and at their direction; waste is generated and disposed of contemporaneously with the process. . . .
>
> Defendants nonetheless contend they should escape liability because they had no authority to control Aidex's operations, and our *NEPACCO* decision states "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." In *NEPACCO*, we were confronted with the argument that only individuals who *owned* or *possessed* hazardous substances could be liable under CERCLA. We rejected that notion and imposed liability, in addition, on those who had the authority to control the disposal, even without ownership or possession. Defendants in this case, of course, actually owned the hazardous substances, as well as the work in process. *NEPACCO* does not mandate dismissal of plaintiffs' complaint under these circumstances. [872 F2d 1381-1382 (citations omitted; emphasis in original).]

Thus, the Aceto defendants' liability was predicated on their having retained ownership of the hazardous substance, a situation not present in the instant case.

We conclude that defendant did not "arrange for disposal" of the heating oil. Plaintiff presented no evidence that defendant's repair of the Carricos' furnace

system included any arrangement or representations other than those pertinent to repair, nor did plaintiff present evidence from which it could be inferred that defendant had authority to control the handling and disposal of the hazardous substance. Further, there is no evidence that defendant disposed of or arranged for the disposal of any substance.

Additionally, defendant's supplemental brief on appeal cites a case decided during the pendency of this appeal, *United States v Cello-Foil Products, Inc*, 848 F Supp 1352, 1356 (WD Mich, 1994), rev'd 100 F3d 1227 (CA 6, 1996), which "tests the periphery of the meaning of 'otherwise arranged for disposal.'" In *Cello-Foil*, a producer of solvents, Thomas Solvents, sold solvents to the defendants and delivered them to the defendants in fifty-five-gallon drums, generally charging its customers, including the defendants, a deposit, which was returned when the drums were returned. 848 F Supp 1355. The returned drums were generally taken to a facility of Thomas Solvents, where they were inspected, and then either sent for reconditioning or refilled. Those that were refilled were sometimes rinsed before being refilled, and the rinse dumped on the ground. *Id.* at 1355-1356. The district court rejected the government's argument that the defendants' agreement to return drums for their deposit to Thomas Solvents was an arrangement for disposal of the solvents. The *Cello-Foil* court held that the "arranged for" provisions in both the CERCLA and the MERA are inapplicable absent a showing that the defendant intended to dispose of the hazardous substance. *Id.* at 1357. The court found persuasive the Seventh Circuit Court of Appeals' analysis of the words "arranged for"—that the words "imply inten-

tional actions." 848 F Supp 1357-1358, citing *Amcast Industrial Corp v Detrex Corp*, 2 F3d 746, 751 (CA 7, 1993) (Posner, J.). The court also noted that the Sixth Circuit Court of Appeals and the District Court for the Western District of Michigan had recognized the principle that arranger liability is dependent upon intentional conduct. 848 F Supp 1357-1358, citing *AM Int'l, Inc v Int'l Forging Equipment Corp*, 982 F2d 989, 999 (CA 6, 1993),[15] and *Kelley v Arco Industries Corp*, 739 F Supp 354, 358 (WD Mich, 1990).[16] On appeal, the Sixth Circuit Court of Appeals reversed, noting that although the district court correctly incorporated a state-of-mind requirement into the "otherwise arranged for disposal" concept, the court had employed an overly restrictive view regarding what is necessary to prove intent, state of mind, or purpose by assuming that intent could not be inferred from

---

[15] *AM Int'l* was an action brought by the seller of real estate and manufacturing equipment against the purchasers. The Sixth Circuit Court of Appeals held that the sale of a building containing useful chemicals does not constitute an arrangement for disposal by the seller, where the seller intended that the chemicals be used in the continued operations at the building, and the chemicals were not transferred with disposal in mind. 982 F2d 998. The court noted that liability only attaches to parties that have taken an affirmative act to dispose of a hazardous substance as opposed to conveying a useful substance for a useful purpose. *Id.* at 999.

[16] *Kelley* involved a suit by a manufacturer against a supplier of neoprene compounds it used in manufacturing rubber products. The manufacturing process included leaching the rubber products manufactured from the neoprene and disposing of the resulting wastewater in a lagoon behind its plant. 739 F Supp 356. Neoprene contained hazardous substances that were leached out in this process. The manufacturer argued that sellers of a hazardous substance should be liable under § 107(a)(3) where the hazardous substance is not a necessary component of a useful product. *Id.* at 357. The *Kelley* court noted the rule that the sale of a useful product that contains a contaminant does not subject a seller to CERCLA liability, and that an affirmative act beyond the sale is necessary for liability for having "arranged for disposal" to attach. *Id.* at 358.

the indirect action of the parties and had overlooked genuine issues of material fact.

Here, the record is devoid of any evidence tending to show that defendant intended to dispose of the heating oil. *Cello-Foil* and the authority cited therein bolsters our conclusion that plaintiff failed to establish that defendant "otherwise arranged for disposal" of the hazardous substance. The circuit court properly granted summary disposition with regard to this claim.

We decline to address plaintiff's argument that a claim of negligent workmanship creates a separate cause of action under the MERA, because the issue lacks apparent merit and was neither briefed nor argued below.

Finally, we observe that defendant's summary disposition motion and this appeal address only defendant's liability under the MERA. Plaintiff's numerous remaining claims against defendant, alleging negligence and other theories, remain.

Affirmed.